******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARJORIE HORNUNG *v.* ROBERT HORNUNG
(SC 19361)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa, Robinson and Vertefeuille, Js.

*Argued November 3, 2015—officially released September 20, 2016*

*Kenneth J. Bartschi*, with whom were *Wesley W. Horton*, and, on the brief, *Richard L. Albrecht* and *Barbara M. Schellenberg*, for the appellant-appellee (defendant).

*Campbell D. Barrett*, with whom, on the brief, were *Jon T. Kukucka, Brandon B. Fontaine, Wayne Effron* and *Johanna S. Katz*, for the appellee-appellant (plaintiff).

*Opinion*

ROBINSON, J. The defendant, Robert Hornung, appeals[1] from the judgment of the trial court setting forth financial orders incident to the dissolution of his marriage to the plaintiff, Marjorie Hornung. In those orders, the trial court directed the defendant to pay to the plaintiff, inter alia, lump sum alimony in the amount of $7.5 million and attorney's fees in the amount of $140,000. On appeal, the defendant claims that the trial court: (1) improperly rendered a lump sum alimony award that constitutes a property distribution in violation of the parties' prenuptial agreement (agreement); and (2) abused its discretion in awarding attorney's fees to the plaintiff in light of its other awards to her. We disagree with the defendant's claim that the lump sum alimony award is actually an improper property distribution, but agree that the trial court abused its discretion in awarding attorney's fees to the plaintiff. Accordingly, we affirm in part and reverse in part the judgment of the trial court.[2]

The record reveals the following facts and procedural history. The plaintiff and the defendant were married in Greenwich in 1997 and have four minor children. The defendant earns $970,000 per year from employment and investments, and received $37 million from the sale of a software program in 2000. The plaintiff, a full-time homemaker and the primary caretaker of the children, presently earns no income. She suffers from a thyroid condition and is borderline diabetic.

Shortly before their marriage, the parties entered into the agreement. The agreement provided for sole ownership of separate property acquired before the marriage, which would not be subject to equitable distribution in the event of dissolution.[3] Marital assets were to be divided in accordance with a formula based upon the length of the marriage and the number of children. The agreement stated that the issues of alimony and child support would be addressed by the courts.[4]

In 2011, the plaintiff brought the present action seeking a legal separation, and later amended her complaint to seek a dissolution of the marriage. After trial, the trial court ordered the defendant to pay, inter alia, $40,000 per month in periodic unallocated alimony and child support, and $7.5 million in lump sum alimony.[5] With respect to the lump sum alimony award, the court noted that "under all the circumstances [the] award . . . is appropriate to provide for continuing support of the [plaintiff]" in light of the following: "[the plaintiff's] health issues; her lack of recent employment; her primary child care responsibilities for four children, which limits her ability to enter the workforce on a full-time basis; and her limited opportunity to acquire assets in the future."[6] In making the award, the court stated that it considered the factors in the alimony statute, General

Statutes § 46b-82,[7] as well as "other factors which may be appropriate for a just and equitable resolution." (Internal quotation marks omitted.) In discussing alimony generally, the court noted that "both parties . . . made significant contributions to the acquisition, maintenance, and preservation of the family assets, including the real estate." The court also ordered the defendant to contribute $100,000 toward the plaintiff's attorney's fees pursuant to General Statutes § 46b-62,[8] reasoning that "to require the [plaintiff], who has minimal earning capacity and the responsibility for the primary care of four minor children age nine through fifteen, three of whom have learning issues, to pay these fees from her portion of the financial award . . . would undermine the purposes of [the] same" and that "it would be fair and equitable for the [defendant] to pay [those fees]." The defendant then filed this appeal. See footnote 1 of this opinion.

The plaintiff subsequently moved for an award of appellate attorney's fees. After a hearing, the trial court ordered the defendant to contribute an additional $40,000 toward the plaintiff's appellate attorney's fees. The court stated that the plaintiff needed "reasonable access to the court system [to] defend an appeal that [the defendant] made" and that she "does not have ample liquid assets" or "resources that are readily available" to pay the fees because several of the trial court's orders were stayed pending the defendant's appeal. Thereafter, the defendant filed an amended appeal challenging the trial court's award of appellate attorney's fees. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant contends that: (1) the lump sum alimony award constitutes a functional property distribution in violation of the agreement; and (2) the trial court abused its discretion in ordering him to pay the plaintiff's attorney's fees. We address each claim in turn.

I

The defendant first claims that the lump sum alimony award is actually a property distribution in violation of the agreement because: (1) in making the award, the trial court considered two factors—the plaintiff's opportunity to acquire assets in the future and her contribution to the marital estate—that appear in the property distribution statute, General Statutes § 46b-81,[9] but not the alimony statute, § 46b-82; and (2) the lump sum award is more than necessary for the plaintiff's continued support, thus indicating that it is functionally a property distribution.[10] In response, the plaintiff contends that the trial court properly awarded lump sum alimony, rather than a disguised property distribution, because: (1) the trial court unambiguously characterized the lump sum award as alimony, and retained discretion to consider equitable factors beyond § 46b-82,

including those listed in § 46b-81, in making the award; and (2) the award was appropriate in light of the standard of living of the marriage, the substantial assets awarded to the defendant under the agreement, and the equitable factors considered by the trial court. We agree with the plaintiff.

The question of whether the trial court properly applied the law when fashioning the lump sum alimony award is a question of law subject to plenary review. See *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010). Although financial orders in family matters are generally reviewed for an abuse of discretion; *Ross* v. *Ross*, 172 Conn. 269, 275, 374 A.2d 185 (1977); this court applies a less deferential standard "when the decision of the trial court is based not on an exercise of discretion but on a purported principle of law." (Internal quotation marks omitted.) *Loughlin* v. *Loughlin*, 280 Conn. 632, 641, 910 A.2d 963 (2006). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." *Borkowski* v. *Borkowski*, 228 Conn. 729, 740, 638 A.2d 1060 (1994).

We conclude that the trial court properly awarded lump sum alimony, and not a property distribution in violation of the agreement, for two reasons: (1) the trial court unambiguously characterized the lump sum award as alimony and, as such, its incidental consideration of two factors in § 46b-81, the property distribution statute, does not demonstrate that the award is a functional property distribution; and (2) the fact that the combined alimony and child support awards apparently exceed the plaintiff's claimed expenses does not demonstrate that the award is actually a property distribution, in light of the standard of living of the marriage and the equitable and statutory factors considered by the trial court.[11] See footnote 10 of this opinion. We discuss each rationale in turn.

A

First, the trial court consistently described the lump sum award as alimony in its decision, articulation, and comments. From the beginning of its decision, the trial court distinguished between the property distribution allowed under the prenuptial agreement and its broad authority to award alimony.[12] Thereafter, the trial court explained that, "under all the circumstances," the purpose of the lump sum award was to provide "continuing support" to the plaintiff—the quintessential purpose of alimony. See, e.g., *Dombrowski* v. *Noyes-Dombrowski*, 273 Conn. 127, 132, 869 A.2d 164 (2005). The purpose of a property distribution, by contrast, is "to unscramble existing marital property in order to give each spouse his or her equitable share at the time of dissolution." (Internal quotation marks omitted.) Id., 133; see also *Blake* v. *Blake*, 211 Conn. 485, 497, 560 A.2d 396 (1989)

("[t]he difference between an assignment of a specific portion of an estate and alimony is in their purposes" [internal quotation marks omitted]). The trial court made no reference or allusion to this equitable purpose in making the lump sum alimony award, and instead divided the property in accordance with the agreement. The trial court also specifically cited § 46b-82, the alimony statute, and two judicial opinions in which lump sum alimony was properly awarded when making the lump sum alimony award.[13] See *Maguire* v. *Maguire*, 222 Conn. 32, 47, 608 A.2d 79 (1992) ("[a]ny ambiguity as to the criteria upon which the court relied for alimony was put to rest [when] the trial court indicated that it had relied upon the criteria in § 46b-82 for its award of alimony").

In light of this language, the trial court's mere mention of two factors in the property distribution statute, namely, the plaintiff's opportunity to acquire assets in the future and her contribution to the marital estate, did not render the lump sum award an improper property distribution.[14] See id., 46–47 (trial court did not improperly predicate alimony award on "impermissible statutory criterion [by] . . . refer[ring] to § 46b-81" in decision); *Blake* v. *Blake*, supra, 211 Conn. 495–99 (trial court's characterization of lump sum payment as alimony in oral decision did not render it alimony, as opposed to property distribution, when court otherwise consistently characterized award as property distribution). In awarding lump sum alimony, the trial court pointed to several considerations, including "the [plaintiff's] health issues; her lack of recent employment; her primary child care responsibilities for four children, which limits her ability to enter the workforce on a full-time basis; and her *limited opportunity to acquire assets in the future.*" (Emphasis added.) The court also noted that throughout the marriage, "both parties . . . made *significant contributions* to the acquisition, maintenance, and preservation of the family assets, including the real estate." (Emphasis added.)

We have repeatedly acknowledged that the statutory factors for awarding alimony and distributing property are "virtually identical."[15] *Sunbury* v. *Sunbury*, 210 Conn. 170, 173–74, 553 A.2d 612 (1989); see also *Greco* v. *Greco*, 275 Conn. 348, 360, 880 A.2d 872 (2005) ("essentially identical"); *Dombrowski* v. *Noyes-Dombrowski*, supra, 273 Conn. 137 (" 'almost identical' "). We have, further, declined to fault trial courts for considering the two factors that appear in the property distribution statute, but not the alimony statute, when awarding alimony, because dissolution actions are "essentially equitable in . . . nature"; *Robinson* v. *Robinson*, 187 Conn. 70, 72, 444 A.2d 234 (1982); and the resulting financial orders are "entirely interwoven."[16] (Internal quotation marks omitted.) *Greco* v. *Greco*, supra, 354; see, e.g., *Blake* v. *Blake*, 207 Conn. 217, 232, 541 A.2d 1201 (1988) ("[i]n determining the assignment

of marital property under § 46b-81 *or alimony under § 46b-82*, a trial court must weigh . . . the *opportunity of each for future acquisition of capital assets and income*" [emphasis added]); *Koizim* v. *Koizim*, 181 Conn. 492, 493, 498, 435 A.2d 1030 (1980) (alimony award not abuse of discretion in part because of wife's "very significant" contributions, "both financial and otherwise," to marriage; "even if we . . . look solely at the other statutory criteria, especially . . . *the contributions that each spouse made to the marriage* . . . the court's [alimony] orders are neither mind boggling, outrageously excessive nor unreasonable" [emphasis added]); *Weinstein* v. *Weinstein*, 18 Conn. App. 622, 634, 638, 561 A.2d 443 (1989) (after "*properly* assessing the parties' relative earning capacities, asset holdings, and *ability to acquire assets*, in accordance with . . . § 46b-82," trial court did not abuse discretion in not awarding alimony to wife because of her "capacity to acquire assets in the future" [emphasis added; internal quotation marks omitted]). In any event, the trial court had discretion to consider these equitable factors when awarding alimony, and their inclusion in the property distribution statute did not render them off-limits to the trial court's analysis.[17] See *Borkowski* v. *Borkowski*, supra, 228 Conn. 743–44 (courts may consider "any other factors which may be appropriate for a just and equitable resolution of the marital dispute" when awarding alimony [internal quotation marks omitted]); *Demartino* v. *Demartino*, 79 Conn. App. 488, 500, 830 A.2d 394 (2003) ("[b]ecause § 46b-82 does not contain an exhaustive list of factors, the court properly may consider other equitable factors when determining an alimony award" [internal quotation marks omitted]); accord *Smith* v. *Smith*, 249 Conn. 265, 283–84, 752 A.2d 1023 (1999) (court could equitably consider husband's travel expenses in seeing children as factor when awarding alimony even though factor is "listed explicitly" in child support regulations).[18]

Although the defendant points to the fact that the trial court considered two factors that appear in the property distribution statute but not the alimony statute, he does not mention that the trial court also considered one factor that appears in the alimony statute, but *not* the property distribution statute. In awarding lump sum alimony, the trial court emphasized the plaintiff's "primary child care responsibilities for four children, which limits her ability to enter the workforce on a full-time basis . . . ." The alimony statute lists as a factor, "the desirability and feasibility of [the] parent's securing employment" in the case of parents to whom the custody of minor children is awarded. General Statutes § 46b-82 (a). The property distribution statute contains no such factor.[19] See General Statutes § 46b-81 (c).

The trial court's articulation also supports the characterization of the award as alimony and not a property distribution. The plaintiff sought an articulation as to

whether the trial court "considered, applied, or intended to apply" a factor in § 46b-81 when it awarded lump sum alimony. The trial court responded: "In making an equitable division of marital property or an award of alimony, whether periodic *or* lump sum, the court must, as it did, consider the statutory criteria set forth in . . . §§ 46b-81 and 46b-82 *respectively*." (Emphasis altered.) The word "respectively" indicates the court's understanding that each statute applies to each type of financial order. This language therefore confirms the trial court's application of § 46b-82, not § 46b-81, when awarding lump sum alimony. The trial court also acknowledged its equitable power to consider "any appropriate additional factors, statutory or otherwise" in its articulation, noting that those powers gave "the court the authority to consider all the circumstances that may be appropriate for a just and equitable resolution of the marital dispute." (Emphasis omitted; internal quotation marks omitted.)

The trial court further differentiated between the lump sum alimony award and its property distribution orders at a hearing on the plaintiff's motion to terminate an appellate stay on several of its orders. The court stated, "I crafted this order . . . [a]nd *I specifically separated what I consider property settlement from . . . lump sum alimony*." (Emphasis added.) The court explained that it awarded both periodic and lump sum alimony in consideration of how the defendant's income "comes in" and "flow[s]" from his various income streams. The court noted that "there's a method to the . . . madness in terms of how the decree is crafted." Thus, the court evidently did not intend to effectuate a functional property distribution by awarding lump sum alimony, but intended to account for the fact that the defendant received some components of his income only a few times per year.

### B

Second, we disagree with the defendant's contention that, because the combined alimony and child support payments exceed the plaintiff's claimed expenses, the lump sum alimony award is a functional property distribution, in light of the standard of living of the marriage and the equitable factors considered by the trial court.[20] See footnote 10 of this opinion. The plaintiff attested to having $65,444 per month in expenses at the time of trial.[21] The $40,000 per month periodic alimony *and child support* payments would not cover this amount. The lump sum alimony payments, however, when combined with these payments, equate to $102,500 per month in total alimony and child support. Although this figure exceeds the plaintiff's claimed expenses, we cannot conclude that this fact alone means that the lump sum award constitutes a functional property distribution. See *Koizim* v. *Koizim,* supra, 181 Conn. 493–94 (upholding total alimony award of $9000 per

month, when wife claimed approximately $7083 per month in expenses and marital expenses were $7500 per month).

First, it is not clear from the record to what extent the trial court considered the plaintiff's expenses, as stated in her financial affidavit, to represent the standard of living of the marriage.[22] See, e.g., *Mavilla* v. *Mavilla*, Docket No. 2011-095, 2011 WL 4975100, *5 (Vt. August 31, 2011) (wife's financial affidavit showed that her "standard of living was far below that established during the marriage and that which husband currently enjoyed"); see also *Stamper* v. *Stamper*, Docket No. A10-109, 2010 WL 3119503, *4 (Minn. App. August 10, 2010) (wife's claimed expenses "reflect[ed] a significantly reduced standard of living compared to the standard enjoyed during the marriage"); cf. *Thomas* v. *Thomas*, Docket No. A13-0905, 2014 WL 802035, *3 (Minn. App. March 3, 2014) (wife's claimed expenses "accurately reflect[ed] the parties' standard of living during the marriage"). Although the primary purpose of alimony is to provide for continuing support of a disadvantaged spouse, the spouse is entitled to maintain the standard of living of the marriage after the dissolution, as closely as possible. See, e.g., *Brody* v. *Brody*, 315 Conn. 300, 313, 105 A.3d 887 (2015) ("[t]he generally accepted purpose of . . . alimony is to enable a spouse who is disadvantaged through divorce to enjoy a standard of living commensurate with the standard of living during marriage" [internal quotation marks omitted]). When the disadvantaged spouse's efforts "increased the other's earning capacity at the expense of [his or] her own," he or she is entitled to "sufficient alimony to ensure the continued enjoyment of [that] standard of living . . . ." (Internal quotation marks omitted.) *Dan* v. *Dan*, 315 Conn. 1, 11, 105 A.3d 118 (2014). Moreover, the parties' children are entitled to continue "the lifestyle to which [they were] accustomed and the standard of living [they] enjoyed before the divorce . . . ." (Internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 108, 995 A.2d 1 (2010).

The parties apparently maintained a high standard of living during the marriage. The defendant valued the marital home at $6.75 million[23] and the parties' vacation home at $1.2 million. Although the defendant's income fluctuated during the marriage, he earned more than $1 million per year in several years of the marriage.[24] The trial court acknowledged that his employment has "proven to be very lucrative." In 2006, for example, he earned $1,687,677, which equates to approximately $140,640 per month. The following year, he earned $1,253,766, or approximately $104,480 per month. He also received an additional $37 million from the sale of a software program three years into the marriage. At the time of trial, the defendant's bank account contained $84,238. Because the plaintiff's efforts as a homemaker and the primary caretaker of the children increased the

defendant's earning capacity at the expense of her own, she is entitled to maintain this standard of living after the divorce, to the extent possible. See, e.g., *Dan* v. *Dan*, supra, 315 Conn. 11; *Brody* v. *Brody*, 136 Conn. App. 773, 790, 51 A.3d 1121 (2012) ("the parties had enjoyed a comfortable lifestyle during their marriage . . . for the benefit of the [wife] and the parties' children, any award of alimony should reflect this quality of life"), rev'd in part on other grounds, 315 Conn. 300, 105 A.3d 887 (2015).

In addition to the marital standard of living, the trial court must also consider the factors in § 46b-82 when awarding alimony. See *Golden* v. *Mandel*, 110 Conn. App. 376, 385, 955 A.2d 115 (2008) ("[t]he standard of living . . . was only one factor that the court considered in making its financial award"). Such factors include: "the length of the marriage, the causes for the . . . dissolution of the marriage . . . [and] the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties . . . ." General Statutes § 46b-82 (a). The trial court must also consider any property distributions made pursuant to § 46b-81 and, "in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment." General Statutes § 46b-82 (a).

Accordingly, the plaintiff's expenses do not represent the only factor that the trial court must consider when awarding alimony. On the contrary, § 46b-82 lists *thirteen* other factors that the court *must* consider when awarding alimony, in addition to the "needs" of the recipient spouse. The court must not only examine the spouse's financial situation at the time of trial, but look ahead to his or her ability to generate income in the future. See General Statutes § 46b-82 (instructing court to consider spouse's "age, health, station, occupation . . . earning capacity, vocational skills, education, [and] employability"). Several of the factors relate in no way to the spouse's expenses, such as the length of the marriage and the cause of the breakdown of the marriage. The trial court must also look to the *payor* spouse's financial situation, in addition to that of the recipient spouse. Specifically, the trial court must consider the *payor's* age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, and employability. These factors have nothing to do with the recipient spouse's claimed expenses. Thus, it cannot be said that the trial court was constrained by the plaintiff's claimed expenses in awarding alimony. The trial court instead had "wide discretion" to ensure that the plaintiff and the parties' children continued to enjoy the standard of living of the marriage for years to come. (Internal quotation marks omitted.) *Brody* v. *Brody*, supra, 315 Conn. 313.

The trial court's resolution of these factors in the present case further militates against characterizing the lump sum alimony award as a property distribution.[25] The parties were married for seventeen years and have four minor children. The children, now ages eleven, fourteen, fifteen, and seventeen, three of whom have learning issues, primarily reside with the plaintiff. The defendant was fifty years old at the time of trial and in "general good health." Although he described a "painful bout of neuropathy" at one point during the marriage, the trial court found that he "is not prevented from working full-time." The defendant has a business degree from Syracuse University, and his primary employment is with his family's window company and its subsidiaries. At the time of trial, the defendant earned nearly $1 million per year from his employment and investments. By contrast, the plaintiff was forty-five years old at the time of trial, suffers from a thyroid condition, and is borderline diabetic. She has a college degree from Emerson College, but did not work for the "greater portion" of the parties' seventeen year marriage. When she did work, she earned approximately $30,000 per year, with a maximum of $65,000 to $70,000 per year. She earned no income at the time of trial and claimed $65,444 per month in expenses. Significantly, the trial court also found that the defendant caused the breakdown of the marriage,[26] characterizing him as a "controlling, emotional bully" and describing his "bizarre" and "demeaning" behavior.[27]

Moreover, the agreement left the defendant with significant assets as compared to the plaintiff. See General Statutes § 46b-82 (trial court "shall consider the . . . estate . . . of each of the parties"); *Golden* v. *Mandel*, supra, 110 Conn. App. 386 ("[i]t is well established that the parties' estate is defined as the *aggregate of the property and liabilities of each*" [emphasis added]); see also *Schmidt* v. *Schmidt*, 180 Conn. 184, 192, 429 A.2d 470 (1980) ("the 'estate' of the parties . . . comprehends the aggregate of the property and liabilities of each"). The trial court ordered the defendant to pay to the plaintiff: $2,082,000, the amount owed her under the prenuptial agreement; $40,000 per month in periodic unallocated alimony and child support for fifteen years; and $7.5 million in lump sum alimony, payable in biannual installments of $375,000. The defendant, however, kept the marital home and the parties' vacation home, in addition to all of his commercial real estate, business ownerships, securities, bonds, bank accounts, and retirement accounts. He received, in total, more than $25 million in assets.[28] By comparison, the plaintiff kept the home she purchased during this dissolution litigation, as well as her bank accounts, retirement accounts, and personal property, which totaled approximately $4.5 million.[29]

The trial court also did not specify how much of the

periodic alimony and child support award should go toward the children's maintenance, as opposed to the plaintiff's support. The trial court, at least, found it appropriate to deviate from the presumptive minimum child support amount under the guidelines based on the defendant's income. Moreover, the parties' four minor children are entitled to maintain the standard of living of the marriage, to the extent possible. See *Maturo* v. *Maturo*, supra, 296 Conn. 108; see also id., 168–69 (*Vertefeuille, J.*, dissenting in part) (noting "new wave" of cases recognizing "the significance of the standard of living of children of affluent parents" [internal quotation marks omitted]). The $40,000 per month award, which would not cover the plaintiff's $65,444 in expenses, was also limited to fifteen years.

In light of these principles, we disagree with the defendant's contention that, because the combined alimony and child support payments exceed the plaintiff's claimed expenses, the lump sum alimony award is functionally a property distribution. The agreement's waiver of equitable distribution of property does not change this result. Although the agreement limited the court's discretion to distribute property, it did not limit the trial court's discretion to award alimony *in any way*. The agreement simply stated that "a court of competent jurisdiction shall address the issues of alimony and/or child support . . . in the event [of] . . . divorce . . . ." Indeed, the Appellate Court recently rejected a nearly identical argument in *Brody* v. *Brody*, supra, 136 Conn. App. 790, in which the trial court properly awarded lump sum alimony despite the existence of a prenuptial agreement in which the parties waived equitable distribution. The husband argued, as here, that "the [trial] court improperly used the award of alimony to effectuate an improper distribution of property in violation of the parties' prenuptial agreement." Id., 788. The Appellate Court disagreed, noting that the trial court had "broad discretion" to award alimony because the prenuptial agreement "by its clear terms, [was] concerned with equitable distributions of property . . . not alimony awards." Id., 791. Accordingly, we conclude that the lump sum alimony award does not constitute a functional property distribution in contravention of the parties' agreement.[30]

## II

We now turn to the defendant's claim that the trial court abused its discretion in ordering him to pay $100,000 of the plaintiff's trial attorney's fees and $40,000 of her appellate attorney's fees, in light of its other awards to her.[31] Specifically, the defendant claims that the plaintiff received ample liquid funds from the trial court's judgment with which to pay her attorney's fees, and that the trial court's conclusion that not awarding her attorney's fees would undermine its other awards to her was unreasonable. In response, the plain-

tiff contends that the trial court properly exercised its discretion in awarding her attorney's fees, and reasonably concluded that not doing so would have undermined its other awards. Additionally, with respect to the appellate attorney's fees award, the plaintiff asserts that she did not have sufficient liquid assets to defend the appeal because several of the trial court's financial orders were stayed pending appeal. We agree with the defendant, and conclude that the trial court abused its discretion in awarding the plaintiff attorney's fees.

Section 46b-62 (a) authorizes the trial court to award attorney's fees in a dissolution action when appropriate in light of the "respective financial abilities" of the parties and the equitable factors listed in § 46b-82. *Turgeon* v. *Turgeon*, 190 Conn. 269, 280, 460 A.2d 1260 (1983); see also footnotes 7 and 8 of this opinion. "[W]e [have] stated three broad principles by which these statutory criteria are to be applied. First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where, because of other orders, the potential obligee has ample liquid funds, an allowance of [attorney's] fees is not justified." *Turgeon* v. *Turgeon*, supra, 280.

"A determination of what constitutes ample liquid funds . . . requires . . . an examination of the total assets of the parties at the time the award is made." (Citation omitted; internal quotation marks omitted.) *Anderson* v. *Anderson*, 191 Conn. 46, 59, 463 A.2d 578 (1983). We have recognized, however, that "[t]he availability of sufficient cash to pay one's attorney's fees is not an absolute litmus test . . . . [A] trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award." *Devino* v. *Devino*, 190 Conn. 36, 38–39, 458 A.2d 692 (1983); see also, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 398, 886 A.2d 391 (2005) (not awarding $100,000 in attorney's fees to wife would have "necessarily eviscerate[d]" any benefit she would have received from $100,000 lump sum alimony award), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

"Whether to allow [attorney's] fees, and if so in what amount, calls for the exercise of judicial discretion" by the trial court. (Internal quotation marks omitted.) *Anderson* v. *Anderson*, supra, 191 Conn. 58. "An abuse of discretion in granting [attorney's] fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Internal quotation marks omitted.) *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 386, 999 A.2d 721 (2010).

In the present case, the trial court ordered the defendant to pay $100,000 of the plaintiff's trial attorney's fees and $40,000 of her appellate attorney's fees. The

trial court reasoned, with respect to the trial attorney's fees award, that "to require the [plaintiff], who has minimal earning capacity and the responsibility for the primary care of four minor children age nine through fifteen, three of whom have learning issues, to pay these fees from her portion of the financial award . . . would undermine the purposes of [the] same" and that "it would be fair and equitable for the [defendant] to pay [those fees]." After the defendant filed an appeal, the trial court awarded the plaintiff an additional $40,000 in appellate attorney's fees, stating that the plaintiff needed "reasonable access to the court system [to] defend an appeal that [the defendant] made." The trial court noted that several of its financial awards to the plaintiff, including the $2,082,000 payment under the agreement, the $375,000 biannual lump sum alimony payments, and the $100,000 trial attorney's fees award, were automatically stayed pending the defendant's appeal. See Practice Book § 61-11 (a). The $40,000 per month periodic alimony and child support payments were not stayed, however, and the plaintiff continued to receive those payments. See Practice Book § 61-11 (c) ("no automatic stay shall apply . . . to orders of periodic alimony, [or child] support"). The trial court also noted that the plaintiff had only $3700 in her bank accounts at that time and, thus, she was "land rich but cash poor."[32] The trial court therefore concluded that the plaintiff did "not have ample liquid assets" or "resources that are readily available" to pay the fees. Four months later, the plaintiff successfully moved to terminate the stay on the $2,082,000 payment and the lump sum alimony award. Specifically, the plaintiff was scheduled to receive the $2,082,000 payment and the first $375,000 installment of the lump sum alimony award by December 19, 2014.

We conclude that the trial court abused its discretion in making the attorney's fees awards because the plaintiff received ample liquid funds as a result of the trial court's judgment, and the trial court's determination that not awarding attorney's fees to the plaintiff would undermine its other awards was unreasonable. See, e.g., *Koizim* v. *Koizim*, supra, 181 Conn. 501. We further disagree with the plaintiff's contention that the appellate stay on the trial court's financial orders justifies the appellate attorney's fees award because the trial court could have terminated the stay sua sponte, and because the plaintiff did, in fact, successfully move to terminate the stay on several of those orders.

First, the trial attorney's fees award represents a very small portion of the liquid assets awarded to the plaintiff in the trial court's judgment. Pursuant to the judgment, the plaintiff would receive: $2,082,000, the amount owed to her under the agreement, within sixty days of the judgment; $40,000 per month in periodic alimony and child support, starting twelve days from the judgment; and $7.5 million in lump sum alimony, payable in bian-

nual installments of $375,000, starting two and one-half months from the judgment. Thus, the plaintiff would receive liquid assets totaling $2,577,000 within three months of the judgment.[33] The trial attorney's fees award represents only 4 percent of this amount.[34] We have previously held attorney's fees awards amounting to a low portion of the payee's liquid assets to constitute an abuse of discretion, since the payee could easily have paid the fees out of those assets, despite the existence of equitable factors supporting the award. See, e.g., *Maguire* v. *Maguire*, supra, 222 Conn. 34–35, 44 ($50,000 attorney's fees award, which amounted to 10 percent of wife's $500,000 in liquid assets, was abuse of discretion, even though parties were married for forty years and had children, husband caused breakdown of marriage, and wife had limited earning capacity);[35] *Blake* v. *Blake*, supra, 211 Conn. 488–89 (concluding that wife could not "reasonably" claim that failure to award $14,948 in attorney's fees and expenses, which amounted to 2 percent of wife's $630,000 in liquid assets, "would undermine or skew the substantial financial awards granted to her" and noting that awarding attorney's fees would be "gilding the lily" where husband had $5,503,000 in total assets and wife had $1,535,000 in total assets); see also *Blake* v. *Blake*, supra, 207 Conn. 218–19 (parties were married for twelve years and had three children).[36] By contrast, this court and our Appellate Court have deemed attorney's fees awards that represent a more substantial part of the payee's liquid assets proper, because not doing so could result in the immediate depletion of those assets, especially when equitable factors support the award. See, e.g., *Unkelbach* v. *McNary*, 244 Conn. 350, 375–77, 710 A.2d 717 (1998) (wife amassed $3250 in attorney's fees and had liquid assets of only $1686); *Eslami* v. *Eslami*, 218 Conn. 801, 818–21, 591 A.2d 411 (1991) (trial court did not abuse its discretion in awarding wife total of $48,230 in attorney's fees and expert witness fees, amounting to 15 percent of wife's total assets, which were comprised of $95,000 in deposits and securities and $300,000 lump sum alimony award, less $70,650 in claimed liabilities, in case where parties were married for thirty years, husband caused breakdown of marriage, there was "great disparity" in parties' income and assets, and wife was in "poor health" and had "substantial continuing medical expenses"); *Ehrenkranz* v. *Ehrenkranz*, 2 Conn. App. 416, 417, 424, 479 A.2d 826 (1984) ($7500 attorney's fees award, which amounted to 50 percent of wife's $15,000 in liquid assets, was not abuse of discretion; parties were married for thirty years and husband caused breakdown of marriage).[37]

Viewed another way, the trial attorney's fees award in the present case represents less than 2 percent of the lump sum alimony award alone, not including the $2,082,000 payment under the agreement or the $40,000 per month periodic alimony and child support pay-

ments. Similar to the comparison with the payee's liquid assets, attorney's fees awards that represent a small portion of the payee's lump sum alimony award have been held improper, because the payee could easily pay his or her own attorney's fees out of that award, even in the wake of strong equitable factors. See, e.g., *Turgeon* v. *Turgeon*, supra, 190 Conn. 270, 279–81 ($10,000 in attorney's fees and $1500 in expert witness fees awards, amounting to 8 percent of $140,000 in total lump sum alimony awards to wife, was abuse of discretion, though parties were married for twenty-three years and husband received $309,000 in assets, compared to wife's $100,000; property and alimony awards to wife were "generous" and "liquid assets being made available [to her were] ample"); *Koizim* v. *Koizim*, supra, 181 Conn. 493–501 ($55,000 in attorney's fees award, amounting to 9 percent of $600,000 lump sum alimony award and 4 percent of $1,410,000 in total assets, not including periodic alimony award, was abuse of discretion where parties were married for twenty-seven years, husband earned $208,000 per year, wife earned $1000 per year, husband was unfaithful, and wife made "significant" contributions to marriage, "both financial and otherwise").[38] Conversely, attorney's fees awards reflecting a more significant portion of the payee's lump sum alimony award, thereby potentially undermining that award, have been held proper, especially when equitable factors support the award. See, e.g., *Holley* v. *Holley*, 194 Conn. 25, 26–27 and n.1, 478 A.2d 1000 (1984) (attorney's fees award of $7500, amounting to 50 percent of $15,000 lump sum alimony award, not including periodic alimony and child support award, not abuse of discretion where parties were married for approximately fifteen years, had one minor child, husband earned $100,000 per year, wife earned $23,000 per year, and husband had $280,000 in separate assets); *Costa* v. *Costa*, 11 Conn. App. 74, 75–77, 526 A.2d 4 (1987) (attorney's fees award of $6000, amounting to 30 percent of $20,000 lump sum alimony award, not including periodic alimony award, not abuse of discretion where husband had $280,000 in assets, wife had $170,000 in assets, husband earned $58,400 per year, and wife "needed treatment for deep depression and had no immediate prospect of being able to work"); see also *Weiman* v. *Weiman*, 188 Conn. 232, 235–37, 449 A.2d 151 (1982) ($10,000 attorney's fees award to wife proper when trial court "could reasonably have concluded that [her] financial resources . . . were necessary to meet her future needs" and alimony awarded to her "was not substantial in amount nor was it for a long period of time").[39]

In the present case, given the vast liquid assets awarded to the plaintiff, and the modest nature of the attorney's fees when compared with those assets, the equitable factors in § 46b-82, as incorporated into § 46b-62, do not justify the award. See *Koizim* v. *Koizim*,

supra, 181 Conn. 500–501 (equitable factors justified lump sum and periodic alimony awards, but not attorney's fees award). As grounds for the trial attorney's fees award, the trial court cited the plaintiff's "minimal earning capacity" and responsibility for caring for the parties' four minor children. The trial court further stated that it would be "fair and equitable" for the defendant to pay the fees. The trial court cited similar concerns with regard to the appellate attorney's fees award. We have stated, however, that attorney's fees "are not to be awarded merely because the obligor has demonstrated an ability to pay" and that "[w]here, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so." *Koizim* v. *Koizim*, supra, 500–501. Although these factors strongly support the validity of the lump sum alimony award, they are outweighed in the attorney's fees context by the fact that the fees represent but a small fraction of the substantial liquid assets awarded to the plaintiff.[40] Cf. *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 383–87 ($64,000 attorney's fees award was proper when "the overwhelming majority of the assets awarded to the [wife] were not liquid assets," given that "[$2.6 million] of the approximately [$3.2 million] in assets awarded to the [wife] consisted of the family home in which the [wife] and the parties' three minor children resided" and "also included her interest in a trust . . . certain retirement accounts, vested stock and vested stock options").[41]

Lastly, the plaintiff argues that the $40,000 appellate attorney's fees award was, at least, proper, because the $2,082,000 payment under the agreement and the lump sum alimony payments were stayed pending the defendant's appeal. Thus, she claims that she did not have ample liquid funds with which to defend the appeal. We are unpersuaded that the stay on these orders justifies the appellate attorney's fees award. The plaintiff always had the option of seeking to terminate the stay. See Practice Book § 61-11 (c). As stated previously, the plaintiff did, in fact, successfully move to terminate the stay several months after the trial court's award of appellate attorney's fees. Furthermore, the trial court had the discretion to terminate the stay sua sponte at any time. See Practice Book § 61-11 (d). Additionally, although the plaintiff's amended financial affidavit showed only $3700 in her bank accounts, she was still receiving $40,000 per month in periodic alimony and child support, and attested to having personal property worth $305,810, a home worth $2.1 million, and other assets worth $79,794.[42] See *Anderson* v. *Anderson*, supra, 191 Conn. 60 (attorney's fees award was abuse of discretion when home would be sold at later date, because sale of home would "yield liquid assets for both parties"). These factors, when considered in light of the substantial liquid assets awarded to the plaintiff, offset the significance of the temporary stay on the

orders.[43]

We, therefore, conclude that the trial court abused its discretion in awarding the plaintiff attorney's fees under these circumstances, thus requiring reversal of the trial court's judgment with respect to those awards.[44] Furthermore, because we conclude that the attorney's fees awards are severable from the trial court's other financial orders, it is not necessary to remand the case for reconsideration of all financial matters. See *Smith* v. *Smith*, supra, 249 Conn. 277. "This court and the Appellate Court have often described financial orders appurtenant to dissolution proceedings as entirely interwoven and as a carefully crafted mosaic, each element of which may be dependent on the other. . . . Every improper order, however, does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors." (Citations omitted; internal quotation marks omitted.) Id. Here, the attorney's fees awards are severable from the trial court's other financial orders and a new hearing on all financial matters is not required.

The judgment is reversed only with respect to the attorney's fees awards to the plaintiff, and the case is remanded with direction to deny the plaintiff's motions for trial and appellate attorney's fees; the judgment is affirmed in all other respects.

In this opinion ROGERS, C. J., and PALMER and VERTEFEUILLE, Js., concurred.

[1] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2. Although the plaintiff has also filed an appeal from the judgment of the trial court, we need not address the issues raised therein. See footnote 2 of this opinion.

[2] The plaintiff also filed a "contingent" cross appeal; see *Fortin* v. *Hartford Underwriters Ins. Co.*, 139 Conn. App. 826, 832 n.2, 59 A.3d 247, cert. granted, 308 Conn. 905, 61 A.3d 1098 (2013) (appeal withdrawn November 26, 2014); challenging the enforceability of the agreement in the event that the defendant prevails in challenging the lump sum alimony award or in the event the case is remanded for a new hearing on all financial matters. She contends, however, that a new hearing on all financial matters is not required if we reverse the trial court's judgment only with respect to the attorney's fees award. See *Montoya* v. *Montoya*, 280 Conn. 605, 617, 909 A.2d 947 (2006) ("Every improper order . . . does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders . . . ." [Internal quotation marks omitted.]); *Maguire* v. *Maguire*, 222 Conn. 32, 47, 608 A.2d 79 (1992) (reversing trial court's judgment with respect to attorney's fees award only and not ordering new hearing on all financial matters). Because we uphold the validity of the lump sum alimony award and do not order a new hearing on all financial matters based on our reversal of the attorney's fees award, we need not address the plaintiff's "contingent" cross appeal.

[3] The agreement provides: "It is the intention of the parties that the disposition of property in this [a]greement be deemed a disposition of property which would fully satisfy any claims which each party may have against each other under the laws of any jurisdiction including their rights to equitable distribution and that the parties hereby specifically waive any equitable distribution."

[4] In 2008, the parties entered into a modification of the agreement. The

modification clarified that the marital home remained the defendant's separate property and that, in the event of divorce, the defendant would pay the plaintiff an additional $3.5 million, representing her interest in the home. All other provisions of the original agreement remained intact.

[5] The trial court's other orders included a $2,082,000 payment to the plaintiff, which represented the outstanding balance owed to her under the agreement, and the defendant's contribution to the children's extracurricular fees, medical and dental expenses, and college education. The defendant does not challenge these orders in this appeal.

[6] In response to the plaintiff's challenge to the enforceability of the agreement, the trial court held that the agreement was valid and enforceable. See footnote 2 of this opinion.

[7] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment."

[8] General Statutes § 46b-62 (a) provides in relevant part: "In any proceeding seeking relief under the provisions of this chapter . . . the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

We note that, although § 46b-62 has been amended since the events underlying the present appeal; see, e.g., Public Acts 2014, No. 14-3, § 5; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[9] General Statutes § 46b-81 (c) provides: "In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[10] We note that the defendant does not argue that the size of the lump sum alimony award *itself* constitutes an abuse of discretion; only that the excessiveness of the award *makes it* a property distribution. All of the defendant's statements with respect to the amount of the award are connected to his argument that the amount of the award indicates that it is a property distribution. He argues that "[b]ecause the lump sum [award] far exceeds what the record shows is necessary for the plaintiff's support . . . the lump sum 'alimony' award is, in fact, a property [distribution] . . . ." Specifically, the defendant contends that, because "the total amount of support far exceeds the plaintiff's claimed expenses . . . the only reasonable view of the lump sum award is that it is functionally a property [distribution]." Put a different way, the defendant asserts that, because the lump sum alimony award is "far more than the record shows is necessary for the plaintiff's support," the "only reasonable conclusion is that the trial court ordered a property distribution . . . ."

Because we are not asked to determine whether the lump sum award, properly characterized as alimony, is so excessive that it constitutes an abuse of discretion standing alone, we make no judgment to that effect. As such, all references in this opinion to the claimed excess in the amount of the award are for the sole purpose of determining whether the amount of the award renders it a property distribution, and not whether the award itself constitutes an abuse of discretion. Although we rely on cases in which the alimony award, itself, constituted an abuse of discretion for guidance, we limit our analysis to the question presented by the defendant.

[11] The defendant also argues that the lump sum alimony award has features of a property distribution because it is nonmodifiable, nontaxable, nondeductible, and survives the death of either party or the remarriage of the plaintiff. It is well settled, however, that alimony awards may—in lump sum

form—be nonmodifiable, nontaxable, nondeductible, and survive the death or remarriage of the parties. See, e.g., *Tremaine* v. *Tremaine*, 235 Conn. 45, 59, 663 A.2d 387 (1995) ("lump sum alimony is generally neither taxable to the payee nor deductible by the payor"); *Scoville* v. *Scoville*, 179 Conn. 277, 279–80, 426 A.2d 271 (1979) ("Lump sum alimony, unlike periodic alimony . . . cannot be modified even should there be a substantial change in circumstances. . . . This is true even if the lump sum alimony is . . . payable in installments." [Citations omitted.]); *Pulvermacher* v. *Pulvermacher*, 166 Conn. 380, 385, 349 A.2d 836 (1974) ("[l]ump sum alimony, even where divided into [installments], is payable in full regardless of future events such as the death of the husband or the remarriage of the wife"); cf. *Parisi* v. *Parisi*, 315 Conn. 370, 384, 107 A.3d 920 (2015) (traditional alimony "typically" taxable and deductible); *Lynch* v. *Lynch*, 153 Conn. App. 208, 224, 100 A.3d 968 (2014) (periodic alimony "accrue[s]" at later date), cert. denied, 315 Conn. 923, 108 A.3d 1124, cert. denied, U.S. , 136 S. Ct. 68, 193 L. Ed. 2d 66 (2015). Thus, those features of the award do not necessarily render it a property distribution.

[12] The trial court stated: "[T]he parties had agreed that in the event of divorce, the [defendant] would pay the [plaintiff] pursuant to the original prenuptial agreement, in accordance with a formula . . . the agreement does not prohibit the award of alimony . . . ."

[13] The trial court cited *Dombrowski* v. *Noyes-Dombrowski*, supra, 273 Conn. 137–38, in which the trial court properly treated a spouse's lottery payments as alimony, rather than as a property distribution, and *Pacchiana* v. *McAree*, 94 Conn. App. 61, 68–71, 891 A.2d 86, cert. denied, 278 Conn. 922, 901 A.2d 1221 (2006), in which the trial court properly awarded lump sum alimony.

[14] The trial court listed § 46b-81 as one of the statutes it considered in fashioning its orders, but apparently only in reference to the enforceability of the agreement. The court noted that it was "mandated to take into consideration a dozen specific factors as set forth in . . . § 46b-81" when contemplating the enforceability of the agreement. Thus, the trial court's citation to § 46b-81 in another part of its decision does not indicate that it considered § 46b-81 in awarding lump sum alimony.

[15] Both §§ 46b-81 (c) and 46b-82 (a) list the following factors to be considered when distributing property *or* awarding alimony: the length of the marriage; the cause of the breakdown of the marriage; and the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, and needs of each of the parties. Three additional factors appear exclusively in § 46b-81 (c): "the opportunity of each [party] for future acquisition of capital assets and income"; "the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates"; and the "liabilities . . . of each of the parties . . . ." Section 46b-82 (a) lists two additional, but different, factors: "the award, if any . . . [made] pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment."

[16] A spouse's ability to acquire future assets also appears related to the concept of the spouse's "station, occupation, amount and sources of income, earning capacity, vocational skills, education, [and] employability . . . ." General Statutes § 46b-82 (a). Moreover, a spouse's contribution to the marital estate may be implicit in the court's consideration of the parties' "estate . . . ." General Statutes § 46b-82 (a); see *Smith* v. *Smith*, 249 Conn. 265, 284, 752 A.2d 1023 (1999) (noting that husband's travel expenses in seeing children "falls squarely within the general criterion of the 'needs of each of the parties'" under § 46b-82). The fact that § 46b-82 (a) mandates consideration of any property awards made pursuant to § 46b-81 when awarding alimony further supports the interrelatedness of the statutes.

[17] The defendant argues that the agreement restricted the trial court's discretion to consider the equitable factors that appear in the property distribution statute. The agreement's language pertaining to alimony, however, does not restrict the trial court's discretion in any way: "The parties agree that a court of competent jurisdiction shall address the issues of alimony and/or child support . . . in the event [of] . . . divorce . . . ." See also *Brody* v. *Brody*, 136 Conn. App. 773, 791, 51 A.3d 1121 (2012) (trial court had "broad discretion" to award alimony because prenuptial agreement "by its clear terms, [was] concerned with equitable distributions of property . . . not alimony awards"), rev'd in part on other grounds, 315 Conn. 300, 105 A.3d 887 (2015). Moreover, it would be imprudent to require the trial court to consider a different set of factors when awarding alimony

in a case in which the parties waived equitable distribution in a prenuptial agreement than under other circumstances.

[18] See Regs., Conn. State Agencies § 46b-215a-5c (b) (3) (A) (listing "significant visitation expenses" as factor in awarding child support).

[19] The fact that this court has not prohibited the trial court from considering the needs of the parties' children when dividing marital property further undermines the defendant's argument. See, e.g., *Blake* v. *Blake*, supra, 207 Conn. 232 ("[w]hich spouse has primary physical custody of minor children is also a consideration *in determining the division of marital assets*" [emphasis added]); see also *Robinson* v. *Robinson*, supra, 187 Conn. 72 (court may consider equitable factors not listed in § 46b-81 when distributing property).

[20] Justice Zarella argues in his dissent that, when a prenuptial agreement distributes all of the property in a dissolution action, an alimony award functions as a property distribution that violates that agreement when it: (1) exceeds the recipient spouse's expenses, plus, if appropriate, a reasonable amount based on the trial court's resolution of the equitable factors; and (2) exceeds the payor spouse's income, thus apparently requiring the spouse to dip into his or her assets. Even if we agree with this formulation of a functional property distribution, we disagree that it applies to this case for two reasons.

First, the defendant does *not* claim that he must invade his assets to make the alimony and child support payments and, accordingly, he does not argue that his need to do so indicates that the lump sum award is a functional property distribution. He simply argues that, because the alimony and child support awards apparently exceed the plaintiff's claimed expenses, the award is actually a property distribution. As acknowledged by Justice Zarella, "this fact alone does not make the lump sum alimony award a functional property distribution." We respectfully disagree, however, with Justice Zarella's subsequent assertion and consideration of the defendant's purported need to dip into his assets—the second factor in his two part test—in concluding that the lump sum alimony award is a functional property distribution. The defendant did not raise or brief this claim and, as such, the plaintiff did not have an opportunity to address whether the defendant had to invade his assets to pay the awards or the effect that it would have on this court's determination of whether the lump sum award is a functional property distribution.

We respectfully disagree with Justice Zarella's contention that the defendant's argument that he must invade his assets is "necessarily subsumed" within his claim that the award is a functional property distribution. The defendant's argument may reasonably be understood as being that, because the award exceeds the plaintiff's claimed expenses, the award is actually a property distribution, regardless of how he *pays* the award—out of his income *or* assets. Cf. *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 635 n.7, 126 A.3d 558 (2015) (respondent's "argument" that "there was a strategic reason not to call an expert" was "subsumed" within its "claim" that "habeas court incorrectly determined that . . . petitioner's trial counsel rendered ineffective assistance by failing to present expert testimony"). Moreover, even if the parties discussed this issue at oral argument, it is well settled that a claim cannot be raised for the first time at oral argument. *State* v. *Lenarz*, 301 Conn. 417, 483 n.22, 22 A.3d 536 (2011). We find Justice Zarella's distinction between claims and arguments unpersuasive in this context, considering the plaintiff's inability to brief and fully respond to the invasion of assets issue. See *Michael T.* v. *Commissioner of Correction*, supra, 635 (petitioner could not claim to have been "ambushed" by respondent's argument that there was strategic reason not to call expert, in support of claim that habeas court improperly determined that petitioner's trial counsel rendered ineffective assistance by not calling expert). We therefore address the issue as squarely presented by the defendant. See also footnote 10 of this opinion.

Second, even if the defendant *had* briefed this claim, we cannot presume that he *must* invade his assets to pay the alimony and child support awards based upon this record. The posture of this case presents us with a significant anomaly. Although the trial court made findings as to the defendant's income at the time of trial, our review of the record indicates that the court did not make any determination as to whether its finding of the defendant's income was also a finding of his *earning capacity*. See General Statutes § 46b-82 (a) (in awarding alimony trial court "shall consider the . . . earning capacity . . . of each of the parties"); *Auerbach* v. *Auerbach*, 113 Conn. App. 318, 334–35, 966 A.2d 292 (court may base financial awards on earning capacity rather than actual earned income), cert. denied, 292 Conn. 902,

971 A.2d 40 (2009). Without establishing this factual predicate, we cannot agree with Justice Zarella's conclusion that the defendant would have to dip into assets that were the subject of the prenuptial agreement, because we cannot presume that the defendant would need to invade those assets to satisfy the awards. See *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012) ("[w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment"). For illustrative purposes, we note that the defendant earned significantly more income—enough to pay the alimony and child support awards without utilizing any assets—in several years leading up to the dissolution of the marriage. For example, in 2006, he earned $1,687,677 in yearly income, which equates to $140,639 per month— more than enough to pay the alimony and child support awards and maintain a considerably high standard of living. The following year, he earned $1,253,766 in yearly income, which equates to $104,480 per month, which is still enough to cover the alimony and child support payments. To the extent that the defendant's earning capacity is, in Justice Zarella's words, "theoretical," it is only so because the trial court did not make such a finding. In the absence of such a finding, we read the record to support, rather than undermine, the trial court's judgment. *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 197, 128 A.3d 901 (2016). Thus, even if we agreed with Justice Zarella's formulation of a functional property distribution, these unusual facts prevent us from agreeing with his application of the formulation to this unique case.

[21] Although Justice Zarella states that the trial court was "entitled to rely on the truth and accuracy of [the parties'] affidavits," he calculates the plaintiff's expenses to be $45,000 per month. Using this figure, in conjunction with the defendant's expenses and the plaintiff's *pendente lite* alimony and child support award, he concludes that the parties need "approximately $45,000 per month" to maintain the marital standard of living. As Justice Zarella acknowledges, however, "[t]he trial court made no finding regarding the marital standard of living or the monthly marital expenses."

[22] The parties did not move for an articulation as to whether the trial court considered the plaintiff's financial affidavit to accurately portray the standard of living of the marriage. Cf. *Matza* v. *Matza*, 226 Conn. 166, 185, 627 A.2d 414 (1993) (trial court explicitly stated that "parties did not during their marriage years enjoy a high standard of living as claimed by the [wife]").

[23] The plaintiff, however, estimated the fair market value of the marital home to be $10 million.

[24] The record reflects that the defendant earned $1,249,989 in 2004, $902,025 in 2005, $1,687,677 in 2006, $1,253,766 in 2007, and $575,262 in 2008.

[25] We look to the standard of living of the marriage and the equitable factors in § 46b-82 to help us determine whether the lump sum alimony award is a functional property distribution. In concluding that these considerations support the characterization of the award as alimony and not a property distribution, we do not suggest that award is "not excessive or improper at all," as Justice Zarella contends in his dissent. As stated previously, we make no judgment as to the excessiveness or propriety of the alimony award *as alimony*. See footnote 10 of this opinion. Although we utilize the same considerations, we do so in an effort to discern whether the lump sum alimony award is actually alimony or a disguised property distribution.

[26] The plaintiff admitted to a one year long affair late in the marriage, but the trial court determined that it did not lead to the breakdown of the marriage. The trial court stated that "ample evidence exists that, while both parties have contributed to said breakdown, the [defendant] must bear the greater share."

[27] Specifically, the trial court stated: "As to the breakdown of the marriage, the [plaintiff] testified at length about the [defendant's] frequent use of inappropriate language and his bizarre behavior, toward her and others, that was both demeaning and . . . crude. In addition, he frequently mimicked her tendency to stutter when placed in stressful situations. She admitted to a [one year] long affair late in the marriage. That relationship, now long since ended, was not the cause of the breakdown. Evidence supports a finding that the cause for the breakdown is primarily attributable to the [defendant]. It is abundantly clear that right from the beginning, with the execution of the . . . agreement, that [the defendant] was not looking for a true marital partner, and has shut the [plaintiff] out both fiscally and emotionally. He is a controlling, emotional bully, who has failed to appreciate [the plaintiff's] true worth as a wife, let alone her contributions. He offers her the minimum, which he believes that he can, in order to preserve the greater bulk of his assets for himself. The [defendant], she said, engaged in frequent, long-winded arguments about his plans, and badgered her to

go along with his ideas, such as the . . . agreement. She told the court that she had a hard time being heard, that [the defendant] ignored her important requests, and that she did not feel that she was a real partner."

[28] This figure accounts for the defendant's $2,082,000 payment to the plaintiff.

[29] This figure includes the $2,082,000 payment owed to the plaintiff under the agreement.

[30] We acknowledge Justice Zarella's concerns with the "practical consequences" of this opinion. To the extent that trial courts, however, may be tempted to circumvent a lopsided property distribution contained in an otherwise enforceable prenuptial agreement by awarding large amounts of alimony, "[j]udicial restraint counsels us to commend the issue to the attention of the legislature for further review . . . ." *Connecticut Podiatric Medical Assn.* v. *Health Net of Connecticut, Inc.*, 302 Conn. 464, 473 n.6, 28 A.3d 958 (2011). The trial court in the present case properly applied the statutory factors in § 46b-82, and properly adhered to the Connecticut Premarital Agreement Act (act) by enforcing the agreement and distributing the parties' property in accordance with that agreement. See General Statutes § 46b-36a et seq. Specifically, with respect to the agreement, the trial court cited the act and concluded that "[u]nder all the facts and circumstances, the [agreement] was fair and equitable at that time, and therefore a valid agreement."

We further note that when a trial court awards a spouse alimony exceeding his or her claimed expenses in the wake of a prenuptial agreement distributing all of the parties' property, the award may still be challenged as *excessive alimony*, rather than a functional property distribution. Today's result does not change this fact. As noted previously, the defendant did not ask us to proclaim the lump sum award as excessive *even if* we determine that the award is *not* a functional property distribution. See footnote 10 of this opinion.

[31] The defendant also claims that the agreement prohibits an award of attorney's fees. The plaintiff argues that this claim is unpreserved because the defendant did not raise this claim at trial, he raised it for the first time in his objection to the plaintiff's postjudgment motion for appellate attorney's fees. See, e.g., Practice Book § 60-5 ("[an appellate] court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"); *Cunniffe* v. *Cunniffe*, 150 Conn. App. 419, 441, 91 A.3d 497 (appellant must "bring to the attention of the court the precise matter on which its decision is being asked" [emphasis omitted]), cert. denied, 314 Conn. 935, 102 A.3d 1112 (2014). Because we conclude that the attorney's fees award constitutes an abuse of discretion even if authorized under the agreement, we need not address the defendant's claim that the agreement bars an award of attorney's fees. Accordingly, we need not consider the plaintiff's contention that the defendant failed to preserve this claim for review. See *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 677 n.11, 99 A.3d 1038 (2014).

[32] In connection with the plaintiff's motion for appellate attorney's fees, the trial court also addressed, for the first time, the defendant's argument that the agreement barred an award of attorney's fees. See footnote 31 of this opinion. The trial court found that the defendant had waived or was equitably estopped from asserting this claim by previously agreeing to pay some of the plaintiff's attorney's fees. See *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 60, 873 A.2d 929 (2005) ("[e]quitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct"); *Lanna* v. *Greene*, 175 Conn. 453, 458, 399 A.2d 837 (1978) (party may waive provisions in contract included solely for his or her benefit); see also *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 58, 970 A.2d 656 (waiver may be implied by conduct), cert. denied, 558 U.S. 991, 130 S. Ct. 500, 175 L. Ed. 2d 348 (2009). During litigation, the parties entered into a stipulation that the trial court made an order of the court, in which the defendant agreed to pay $250,000 of the plaintiff's attorney's fees. The trial court noted in its oral decision on the plaintiff's motion for appellate attorney's fees that, even if the agreement barred an award of attorney's fees, the defendant "basically undercut the terms of the agreement" by agreeing to pay some of the plaintiff's attorney's fees pendente lite. The defendant argues that the trial court's finding that he waived or was equitably estopped from claiming that the agreement bars an award of attorney's fees was clearly erroneous, because the parties agreed in the stipulation that "[t]he [plaintiff] shall not be precluded from seeking additional [attorney's] fees, pendente lite, and

the [defendant] shall not be precluded from opposing the [plaintiff's] request for additional [attorney's] fees." See *Banks Building Co., LLC* v. *Malanga Family Real Estate Holding, LLC*, 102 Conn. App. 231, 239, 926 A.2d 1 (2007) ("waiver [is a question] of fact . . . we will not disturb the trial court's [finding] unless [it is] clearly erroneous" [internal quotation marks omitted]); see also *Fischer* v. *Zollino*, 303 Conn. 661, 667–68, 35 A.3d 270 (2012) (reviewing trial court's finding of equitable estoppel for clear error). Because we hold that even if the agreement authorized an award of attorney's fees, such an award constituted an abuse of discretion under the circumstances, we need not address the defendant's claim that the agreement bars an award of attorney's fees. See footnote 31 of this opinion. We therefore need not address the defendant's challenge to the trial court's finding that he had waived or was equitably estopped from asserting this claim.

[33] The trial court's judgment, dated March 20, 2014, ordered the defendant to pay to the plaintiff: $40,000 per month commencing April 1, 2014; $375,000 every six months commencing June 1, 2014; and $2,082,000 within sixty days of the judgment.

[34] The combined trial and appellate attorney's fees awards represent less than 6 percent of this amount.

[35] We respectfully disagree with Justice Eveleigh's argument in his dissent, that *Maguire* is "easily distinguishable" from the present case. Justice Eveleigh argues that, contrary to *Maguire*, the following equitable factors justify the attorney's fees awards in the present case: the parties' seventeen year marriage; the defendant's mistreatment of the plaintiff, which caused the breakdown of the marriage; and the plaintiff's limited earning capacity. All of these factors, however, weighed heavily in *Maguire*—some even more so than in the present case—but this court nonetheless determined in *Maguire* that the attorney's fees award constituted an abuse of discretion. *Maguire* v. *Maguire*, supra, 222 Conn. 43–45. In *Maguire*, the parties were married for *forty* years, rather than seventeen, and the husband mistreated the wife. Id., 35 ("[the wife's] participation as the linchpin of the family, as the wife, lover, mother, homemaker . . . means, and has meant, nothing to the [husband]" [internal quotation marks omitted]); see also id., 34–35 (" 'In all the years of their marriage . . . the [husband] never placed any property in his wife's name . . . . He has provided for their children who are totally self-sufficient. He has provided for the future for his secretary and for himself, but not for his wife. He dismissed her fears and concerns for her future with the comment "the [s]tate will take care of you." ' "). The wife in *Maguire* had a limited earning capacity, and was sixty years old, compared to the plaintiff's forty-five years. See id., 35 ("[t]his woman is . . . past her peak as an active real estate saleswoman, and the real estate business is in shambles" [internal quotation marks omitted]). The wife in *Maguire* also received more than $3 million in assets, not including her $500,000 in liquid assets, just as the plaintiff received more than $4 million in assets, not including the liquid assets she would receive from her other awards. Id., 41 n.8, 44. Despite these factors, this court concluded in *Maguire* that "nothing in the record" would support a finding that the attorney's fees award was necessary to avoid undermining the wife's other awards. Id., 44–45.

[36] Justice Eveleigh asserts in his dissent that *Blake* is distinguishable based on the trial court's attempt to punish the husband with the attorney's fees award. We disagree. In *Blake*, the court did not reverse the award of attorney's fees based solely on the trial court's attempt to "punish" the husband. See *Blake* v. *Blake*, supra, 211 Conn. 487–89. Rather, the court went on to determine whether the award constituted an abuse of discretion under, inter alia, § 46b-62, *Koizim* v. *Koizim*, supra, 181 Conn. 492, and *Fitzgerald* v. *Fitzgerald*, 190 Conn. 26, 29–30, 459 A.2d 498 (1983), none of which concern punishment of a litigant through an attorney's fees award. *Blake* v. *Blake*, supra, 211 Conn. 487–89; see also id., 489 ("*In the light of the plaintiff's net assets of over* [*$1.5 million*] *and her liquid assets of $630,000*, it cannot reasonably be claimed that the failure to award $14,947.63 for attorney's fees and expenses would undermine or skew the substantial financial awards granted to her in the dissolution judgment. To award counsel fees under these circumstances is gilding the lily. The court abused its discretion in making such an order." [Emphasis added.]). Accordingly, we disagree with Justice Eveleigh's argument that *Blake* is "distinguishable from the facts of the present case."

[37] But see *Emanuelson* v. *Emanuelson*, 26 Conn. App. 527, 533–34, 602 A.2d 609 (1992) (attorney's fees award amounting to 3 percent of wife's liquid assets not abuse of discretion in light of parties' thirty-five year marriage, fact that husband caused breakdown of marriage, and "great disparity" between

parties' earning capacities).

[38] Although this court and the Appellate Court did not actually calculate the percentage of the alimony award that the attorney's fees award represented in these cases, they did compare the size of the attorney's fees award to the alimony award. In fact, they could not avoid such comparisons in order to determine whether the spouses had "ample liquid funds" with which to pay the attorney's fees, or whether an award of attorney's fees was necessary to avoid undermining their alimony awards. *Anderson* v. *Anderson*, supra, 191 Conn. 59. Calculating the percentages in these cases only helps compare them to the present case for illustrative purposes, notwithstanding Justice Eveleigh's criticism of these calculations in his dissent.

[39] But see *Devino* v. *Devino*, supra, 190 Conn. 38–39 (attorney's fees award amounting to 7 percent of lump sum alimony award was not abuse of discretion, when wife had only $2000 in assets and income of $200 per week); *Pacchiana* v. *McAree*, 94 Conn. App. 61, 71–72, 891 A.2d 86 (attorney's fees award amounting to 4 percent of lump sum alimony award not abuse of discretion due to wife's "relatively low level of earnings," husband's "periodic receipt of substantial distributions from his investment activities," and court's decision not to award periodic alimony to wife), cert. denied, 278 Conn. 922, 901 A.2d 1221 (2006).

[40] We disagree with Justice Eveleigh's characterization in his dissent of our analysis as a "purely mathematical calculation . . . ." We simply use percentages to place our prior case law into perspective, in light of the massive financial awards rendered in this case. We do not contend that attorney's fees awards amounting to 4 or 6 percent of a spouse's assets constitute a per se abuse of discretion. See, e.g., *Damon* v. *Damon*, 23 Conn. App. 111, 113–14, 579 A.2d 124 (1990) ("[a]lthough the assets awarded to the [husband] equaled more than 85 percent of the total marital assets, that is not a per se abuse of discretion"). Rather, these percentages elucidate the financial circumstances of the parties and help us determine whether the equitable factors justify the award of attorney's fees. In this vein, we do not "ignore" the equitable factors or attempt to "boil down these [equitable] considerations to a mathematical equation" as Justice Eveleigh suggests. We instead evaluate the equitable factors in the context of these percentages.

Furthermore, we see no reason why such calculations should be barred in the attorney's fees context when both this court and the Appellate Court have used similar calculations to evaluate divisions of property under § 46b-81 and alimony awards under § 46b-82, in conjunction with the equitable factors listed in those statutes, which are the same as those applicable under § 46b-62. See footnote 15 of this opinion; see also, e.g., *Greco* v. *Greco*, supra, 275 Conn. 356, 360 (concluding that, "[u]nder the circumstances" presented, award providing "98.5 percent of the marital estate" to wife and "less than 2 percent" to husband was improper); *Sweet* v. *Sweet*, 190 Conn. 657, 664, 462 A.2d 1031 (1983) (upholding awards when trial court properly "considered *all the statutory factors, including the fact that the marital home represented almost 90 percent of all family assets*" [emphasis added]); *Turgeon* v. *Turgeon*, supra, 190 Conn. 279 (husband properly awarded "approximately 76 percent" of total marital assets); *Koizim* v. *Koizim*, supra, 181 Conn. 496–97 (upholding property and alimony awards when assets distributed to plaintiff represented "52 percent of the total assets as calculated by the plaintiff and 46 percent of the total assets as calculated by the defendant," and noting that "[c]alculated another way, the value of assets" would represent "39 percent of family wealth"); *Pellow* v. *Pellow*, 113 Conn. App. 122, 129, 964 A.2d 1252 (2009) (alimony and child support awards consuming "more than 90 percent" of husband's income excessive); *Valentine* v. *Valentine*, 149 Conn. App. 799, 807, 90 A.3d 300 (2014) (alimony and child support payments that "constituted more than 80 percent" of husband's income was abuse of discretion).

Ultimately, not including these percentages in our opinion, and simply listing the panoply of financial awards in our prior cases, along with the equitable factors, would be unhelpful to the bench, bar, and members of the public who rely on our opinions for meaningful guidance.

[41] In *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 389, this court made the following observation: "[T]he trial court determined that the [husband] had used the parties' marital assets to pay his attorney's fees . . . . By requiring the [husband] to pay an additional $50,000 of the [wife's] trial attorney's fees and a portion of her appellate attorney's fees, it is reasonable to presume that the trial court was attempting to equalize the amount of marital assets that were used to pay each of the parties' attorney's fees."

[42] The plaintiff, however, claimed monthly expenses of $44,332 and liabili-

ties of $68,142, not including the attorney's fees.

[43] But see *Ehrenkranz* v. *Ehrenkranz*, supra, 2 Conn. App. 424 ($7500 attorney's fees award not abuse of discretion, when wife had $15,000 in liquid assets, and $2500 per month periodic alimony payments and first $23,000 installment of $116,000 lump sum alimony award were stayed pending husband's appeal).

[44] Like Justice Eveleigh, "[w]e are fully cognizant of the reluctance of appellate courts in Connecticut to disturb the discretionary findings of the trial court in dissolution cases. . . . Delay and uncertainty create hardship for all concerned, more frequently for the recipient of the disputed award. . . . Reluctance to reverse the trial court's exercise of discretion, however, should not mean that the door is entirely closed to successful appeals in dissolution cases. Limited appellate review in dissolution cases must not be a mere shibboleth on the basis of which the appellate court makes such review a nullity. . . . This practice does not establish the proposition that such an award should never be disturbed, but rather that it should be disturbed only under the clearest circumstances." (Footnote omitted; internal quotation marks omitted.) *Ehrenkranz* v. *Ehrenkranz*, supra, 2 Conn. App. 421. In the present case, when the attorney's fees awards represent such a miniscule amount of the spouse's liquid assets and total financial awards, the "clearest circumstances" are present. Id. We must be mindful not to "abdicat[e] . . . our responsibility for appellate review" in these matters. *Koizim* v. *Koizim*, supra, 181 Conn. 498.