******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BETH E. ANKETELL *v.* MARTIN KULLDORFF
(AC 42452)

Alvord, Prescott and Lavine, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court
dissolving his marriage to the plaintiff. At the time of the dissolution
trial, the plaintiff worked as a per diem nurse with hours that varied
considerably. The defendant worked as a biostatistician, and his income
was dependent on the number of his employer's ongoing grant funded
projects. At the time of the trial, his salary was approximately 50 percent
of what his annual income had been during the five preceding years
due to the expiration of at least three grants, which he and his colleagues
were working to replace. The defendant remained in the parties' marital
home in Ashford, which he had purchased prior to their marriage. The
parties also jointly owned a home in Nicaragua. During the marriage,
the defendant made two payments in excess of the scheduled monthly
payments on the Ashford home mortgage without the plaintiff's consent.
Additionally, after the filing of the dissolution action and the issuance
of the automatic orders, the defendant transferred funds into education
trust accounts for the parties' two minor children and the defendant's
minor child from a previous marriage without consulting the plaintiff.
The trial court, inter alia, dissolved the marriage, awarded the parties'
joint legal and physical custody of their two children, entered a parenting
time schedule, and permitted the plaintiff to relocate to Worcester,
designating her residence as primary for purposes of school following
the relocation. The trial court ordered the defendant to pay child support
in the amount of $325 per week, which it stated was a downward
deviation from the guideline amount. The trial court also ordered the
defendant to pay to the plaintiff a lump sum property settlement, which
it stated included settlement for the plaintiff's share of the Nicaragua
property, along with partial reimbursement for the funds transferred
into the children's education trust accounts and the overpayments on
the Ashford home mortgage. The defendant appealed, and the plaintiff
filed a motion for order of attorney's fees, requesting that the defendant
pay the retainer for her appellate attorney. Following a hearing on the
matter, the trial court granted the motion and the defendant amended
his appeal to include a challenge to the attorney's fees award. *Held*:

1. The trial court did not err by failing to identify the presumptive child
   support obligation under the child support guidelines, as set forth in
   the applicable regulations (§ 46b-215a-1 et seq.), nor did it improperly
   calculate the presumptive amount for the defendant: the trial court
   explicitly stated that it had found the presumptive amount associated
   with each party's then current income to be $300 per week, determined
   that the presumptive amount was unfair and inequitable, deviated the
   amount upward on the basis of the defendant's earning capacity to $473
   per week, and then deviated the amount downward to $325 per week
   in the interest of fairness to reflect the parties' shared custody, the
   defendant's variable income, and his increased commuting expenses
   resulting from the plaintiff's relocation; moreover, the trial court pro-
   vided sufficient justification for its application of the deviation criteria
   of earning capacity, as it found that the presumptive support amount
   calculated with the defendant's then current income would be unfair
   and inequitable, the defendant's earnings were at or near the top of his
   salary range during the five years preceding the trial before his annual
   income dropped nearly 50 percent to its then current level, and it was
   not credible that the defendant would be unable to earn more than he
   was then making.

2. The trial court did not err in its calculation of the parties' incomes:
   the trial court's finding regarding the defendant's earning capacity was
   supported by evidence in the record of the defendant's prior earnings,
   and its determination that the defendant could expect to earn more
   than he was earning at the time of trial was reasonable; moreover, the
   trial court did not abuse its discretion in calculating child support on

the basis of the plaintiff's actual income rather than attributing to her a greater earning capacity that was reflective of a work week of more than eighteen hours because its findings that, due to the intense nature of the nursing profession, it was not necessarily advisable for the plaintiff to work as many hours as were available and that her per diem employment both maximized her hourly rate and allowed her flexibility to care for the parties' children, were supported by the record.

3. The trial court did not abuse its discretion in awarding the plaintiff a lump sum property settlement: contrary to the defendant's claim, the trial court did not make an effective finding of dissipation by awarding the lump sum property settlement to the plaintiff, as, in doing so, the trial court used language that was consistent with the equitable determinations involved in the distribution of marital property, did not reference "dissipation" in its memorandum of decision or its articulations, and made its finding on the basis of its determination that the defendant had unilaterally allocated portions of the marital estate in accordance with his own financial priorities; moreover, the trial court's order dividing the parties' property was not an abuse of discretion because it determined that the defendant's overpayments on the Ashford home mortgage and his deposits into the children's education trust accounts were made without the input of the plaintiff and had the effect of reducing the liquid assets available for distribution.

4. The trial court did not err in awarding the plaintiff appellate counsel fees: many of the assets awarded to the plaintiff in the dissolution judgment were not easily liquidated and her attorney's appellate retainer amounted to almost 40 percent of her liquid assets; moreover, the trial court found that requiring the plaintiff to pay the retainer would undermine the financial awards made in the dissolution judgment, the defendant did not demonstrate that such finding was unreasonable, and the trial court explicitly stated that it had considered the criteria set forth in the applicable statute (§ 46b-82) in making its determination.

5. The trial court did not abuse its discretion in entering its custodial orders: with respect to its orders designating the Worcester home as primary for school enrollment purposes, because the trial court had before it testimony from both parties relating to their positions on the Ashford and Worcester school systems and the recommendation of the family services counselor, the defendant essentially was requesting that this court reweigh the evidence in his favor, which it declined to do, as it was not this court's role to retry the facts or evaluate the credibility of witnesses; moreover, the trial court's order relating to the 6:15 a.m. transfer time for the physical custody of the parties' children was supported by the record, which included evidence that the children wake up early and that such transfer time would permit the plaintiff to work day shifts; furthermore, in its memorandum of decision, the trial court stated that, in making its orders, it took the criteria set forth in the applicable statute (§ 46b-56 (c)) and applicable case law into consideration and had applied the same to the evidence before it.

Argued May 18—officially released September 28, 2021

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Windham and tried to the court, *Green, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court. *Affirmed.*

*Campbell D. Barrett*, with whom were *Johanna S. Katz* and, on the brief, *Jon T. Kukucka*, for the appellant (defendant).

*Scott T. Garosshen*, with whom were *Karen L. Dowd* and, on the brief, *Kenneth J. Bartschi*, for the appellee (plaintiff).

*Opinion*

ALVORD, J. The defendant, Martin Kulldorff, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Beth E. Anketell. On appeal, the defendant claims that the trial court (1) erred by failing to identify the presumptive child support obligation under the child support guidelines, as set forth in § 46b-215a-1 et seq. of the Regulations of Connecticut State Agencies (guidelines), before entering a support order based on a deviation, (2) erred in calculating the parties' incomes, (3) erred in awarding the plaintiff a lump sum property settlement, (4) abused its discretion in awarding appellate attorney's fees to the plaintiff, and (5) abused its discretion in entering its custodial orders. We affirm the judgment of the court.

The following facts and procedural history are relevant to our resolution of the present appeal. The parties married on July 16, 2011, and have two minor children together. The plaintiff commenced this dissolution action on October 5, 2016. A trial was held on September 13 and 14, 2018. On December 3, 2018, the court, *Green, J.*, issued its memorandum of decision in which it made the following relevant factual findings. Both parties had been married once before. The defendant has a teenaged child from his first marriage, and he shares joint custody of that child with his first spouse. The defendant has primary physical custody of his first child and lives in Ashford, as the defendant determined that his first child should live there in order to complete his high school education at E.O. Smith High School. The home in Ashford (Ashford home) was purchased by the defendant prior to the parties' marriage, and the parties lived there during the marriage.

In 2012, the defendant paid for the plaintiff's nursing education at the University of Connecticut. Prior to the birth of the parties' children in 2015, the plaintiff worked twenty-nine hours per week, which was considered a full-time position, as a nurse at UMass Memorial Medical Center in Worcester, Massachusetts. While working full time, the plaintiff elected not to participate in her employer's retirement plans. Following the birth of the parties' children, the plaintiff returned to work as a per diem nurse. Because her position is per diem, it is without fringe benefits, and her income depends on the number of hours she works. During the pendency of the dissolution proceedings, the plaintiff's work hours varied considerably.

The defendant has earned a PhD and works as a biostatistician for Brigham and Women's Hospital in Boston. The defendant receives income from drug safety research grants. The grants direct overhead funds to the defendant's employer, which then pays the defendant's salary. His income depends on the number of grant-funded projects that are ongoing at any particu-

lar time.

At the time of the dissolution trial, the plaintiff had moved to a rental property in Tolland, but she owns a home in Worcester, Massachusetts (Worcester home). The Worcester home is occupied by tenants, and their rental payments cover the mortgage and taxes and provide a modest income. The plaintiff planned to move to the Worcester home following the dissolution of the parties' marriage. During the marriage, a $15,000 balloon payment became due on a second mortgage on the Worcester home. The plaintiff and the defendant disputed whether the decision for the plaintiff to opt out of her employer's retirement benefit plan in order to focus on utilizing her employment earnings toward the balloon payment was made as a couple or unilaterally by the plaintiff. The parties agreed, however, that the balloon payment was to be made out of funds the plaintiff had saved and allocated. Following the balloon payment on the Worcester home, the defendant made two $10,000 mortgage payments, over and above the usual monthly payments due on the mortgage, on the Ashford home. The decision to make additional mortgage payments on the Ashford home was made unilaterally by the defendant.

After the filing of this dissolution action and following the issuance of the automatic orders, the defendant transferred funds into Connecticut Higher Education Trust (CHET) accounts for the parties' children and transferred additional funds into a CHET account for the defendant's older child. The decision to transfer funds into the CHET accounts was made unilaterally by the defendant.

The parties own a home and attached business in Nicaragua, which they purchased in 2015. Because of unrest in the country, estimates of the value of any equity in the property vary substantially. The parties agreed that if the country became more stable, discussions of the property and its possible disposition would be less theoretical. The parties also each own ten cows and their calves in Nicaragua, although the welfare of the animals is not known.

Attorney Rachel Sarantopoulos, the family services counselor, conducted an evaluation. Her overall assessment was that both parties are able, loving parents. Sarantopoulos recommended that the plaintiff be permitted to relocate to Worcester and that her Worcester home be designated as primary for school purposes. Sarantopoulos otherwise recommended that the parties' pendente lite shared custody plan, which had been entered into by agreement and managed by the parties with few conflicts, be continued.

The court dissolved the marriage on the ground of irretrievable breakdown and entered the following orders relevant to this appeal. The court awarded no

alimony to either party. The court awarded the parties' joint legal and physical custody of their children and entered a parenting time schedule. The court permitted the plaintiff to relocate to Worcester and designated the plaintiff's residence as primary for purposes of school.[1] The court ordered the defendant to continue to maintain the CHET accounts for the benefit of the parties' children.

The court ordered the defendant to pay child support in the amount of $325 per week. The court stated that such amount was "a downward deviation from the guideline amount of $473 based on the shared parenting plan, the increased commute associated with [the plaintiff's] residence in Worcester, [the defendant's] variable income as well as his demonstrated earning capacity, which is very near or at the top of his salary range."

The court ordered the defendant to pay the plaintiff "a lump sum property settlement of $52,500," which, the court stated, "includes settlement for the plaintiff's marital share of the Nicaragua house, partial reimbursement for funds transferred to the children's CHET accounts and mortgage overpayments on the Ashford [home] made by the defendant."

With respect to other property orders, the court ordered the defendant to transfer $175,000 to the plaintiff from his "retirement funds/accounts of his choice . . . ." The court ordered the plaintiff to transfer her interest in the property in Nicaragua to the defendant and awarded the defendant ownership of all the cows and calves in Nicaragua.[2] The court ordered that the parties retain all assets presently in their respective names, including the Ashford home, which would remain the property of the defendant, and the Worcester home, which would remain the property of the plaintiff.[3]

On January 4, 2019, the defendant filed the present appeal. On January 14, 2019, the plaintiff filed a motion for order of attorney's fees, requesting that the court order the defendant to pay the $25,000 retainer of her appellate attorney. The court granted the motion on August 23, 2019. The defendant thereafter amended his appeal to include a challenge to the court's award of attorney's fees.

After filing this appeal, the defendant filed a motion for articulation, which the trial court denied. The defendant then filed a motion for review with this court. This court granted the motion in part and ordered the trial court "to articulate as to its determination of the parties' respective annual incomes and/or earning capacity, and the value at the time of the dissolution judgment of all assets that have been distributed, and the court's rationale for its financial orders in light of the articulated findings."

In response, the trial court issued a December 5, 2019 articulation setting forth its findings (first articulation).

The court stated that "shorter work weeks seemed appropriate" for the plaintiff, given the nature of her work. It credited the plaintiff's explanation of her pay structure and evidence that full-time employment with her employer constituted less than forty hours per week. The court found that "[m]aintaining per diem employment maximizes the plaintiff's hourly rate and allows for flexibility for caring for the children depending on the access schedule . . . ."[4] (Citation omitted.) The court rejected the defendant's position at trial that it would be inequitable to allow the plaintiff to work less than forty hours per week and noted that the defendant's proposed parenting plan had been designed to maximize opportunity for the plaintiff to work more hours.

The court articulated that, although the defendant worked forty to forty-five hours per week, the number of hours he worked did not determine his income. Rather, the defendant's income was dependent on the number of grant-funded projects being worked on at a particular time. The court stated that the defendant "works for an organization that caps his income at the nearly $200,000 per year that he was making at the time of the filing for dissolution and not the nearly $100,000 that he was making at the time of the trial . . . ." (Citation omitted.) It articulated its finding that the defendant "cannot make more than the salary cap but can make substantially less if there are fewer or no grant-funded projects. Line items in the active grants provide direct payments to the organization and the organization then pays the defendant." The court stated that the defendant also consistently had earned nearly $200,000 in a similar role with a prior employer.

The court credited the defendant's testimony that the nature of his work and associated compensation will be somewhat variable. The court referenced testimony regarding the expiration of at least three grants and that the defendant and his colleagues were making efforts to replace those grants. The court found that the defendant's earnings were at or near the top of his salary range from 2013 through 2017, before "dropping nearly 50 percent to its current level."[5] The court "did not find it credible that the defendant will be unable to earn more than he is making currently."

The court articulated that, "[t]hroughout the marriage, the defendant continued to save for his retirement at a rate of roughly $500 per week . . . but declined to consider improvements on the marital home, a larger home, a larger and more comfortable family car and resisted the plaintiff's urging for items to prepare for the arrival of the twins . . . ." (Citations omitted.)

With respect to the court's child support award, the court articulated: "In light of the court's determination of earning capacity, child support based on the pre-sumptive amount associated with each party's current

income ($300 / week payable to [the plaintiff]) was determined to be unfair and inequitable. The court also determined that child support based upon the defendant's consistent, prior income and the plaintiff's current income would also be unfair and inequitable ($473 per week payable to [the plaintiff]) given the defendant's current income. Child support was awarded to [the plaintiff] at a rate of $325 per week, which is the same amount that the parties had agreed to pendente lite. This figure takes into account both earning capacity and variability of income on the defendant's part as well as other factors including shared custody and increased commuting expenses previously cited within the judgment. Child support was awarded to [the plaintiff] because she makes less money than the defendant with credible reasons therefore. There was no evidence adduced that either party was inclined towards extravagances and [the defendant] raised sincere and credible concerns about the urgency of fully funding his retirement given the eight year age difference between himself and the plaintiff . . . . He has both paid child support at this rate and has continued to save roughly $500 / week towards his retirement." (Citation omitted.)

The court also articulated its decision with respect to the lump sum property settlement of $52,500. Specifically, it stated: "[The additional mortgage payments on the Ashford home] came as a surprise to the plaintiff. The decision to make these payments as well as the deposits to CHET accounts held by the defendant were made unilaterally. The court noted that the plaintiff was not seeking that monies placed in [the defendant's older child's] account and in the accounts designated for each of the twins be returned but in the interest of equity and fairness the court's cash settlement order included reimbursement for the use of marital funds transferred without the input of the plaintiff." The court further stated: "[T]he defendant had made several significant, unilateral financial decisions during the course of the marriage and during the pendency of the dissolution. The court credited testimony that the defendant did not discuss his decision to make a $20,000 payment on the Ashford [home] mortgage . . . . After the filing for divorce, the defendant transferred $20,000 into [the parties' children's] CHET accounts and $40,000 into [the defendant's older child's] account . . . . These transfers were also not discussed with the plaintiff . . . ." (Citations omitted.) The court stated that it had entered "no orders regarding the parties' respective home[s] other than endorsing sole ownership without any claim by the other."

The court also articulated that the defendant "had demonstrated inflexibility and that his loving support of [the plaintiff] had given way to hostility and parsimony." The court stated that the defendant "was protective of his own finances to the detriment of his relationship with the plaintiff and was resentful of challenges to his

financial priorities and decisions." The court concluded by stating that it had made its financial awards "based on financial inequities within their marital partnership."

The defendant thereafter filed with this court a second motion for review, which was granted. This court ordered the trial court to articulate "specifically what dollar amount the court found for the parties' earning capacities and/or annual incomes and the specific value found for each of the assets." On January 24, 2020, the trial court issued its articulation (second articulation),[6] in which it stated that it found the defendant to have an earning capacity of $198,536 per year. It stated: "[C]alculations were based on this figure and a net income of $138,424, as reported on his financial affidavit of September, 2017. [The defendant] reported having earned: $184,000 in 2016; $180,000 in 2015; $202,000 in 2014 and $195,000 in 2013." The court articulated that it found the plaintiff's income to be $56,576, with a net income of $49,192, and explained that this income was reported in the plaintiff's financial affidavit of September, 2018. See part II of this opinion. The court found the value of the CHET accounts for each of the parties' children to be $11,656.07 and the value of the CHET account for the defendant's older child to be $11,656.07. See footnote 11 of this opinion. Additional facts will be set forth as necessary.

I

The defendant's first claim on appeal is that the court erred in calculating the presumptive child support amount pursuant to the guidelines. Specifically, he contends that the court improperly calculated the presumptive amount on the basis of his earning capacity rather than his actual income. We disagree.

We first set forth applicable legal principles. "Under the [child support] guidelines, the child support obligation first is determined without reference to earning capacity, and earning capacity becomes relevant only if a deviation from the guidelines is sought" under § 46b-215a-5c (b) (1) (B) of the Regulations of Connecticut State Agencies. (Internal quotation marks omitted.) *Fox* v. *Fox*, 152 Conn. App. 611, 635, 99 A.3d 1206, cert. denied, 314 Conn. 945, 103 A.3d 977 (2014). "[T]he amount of support determined without reference to the deviation criteria is presumed to be the correct amount of support, and that presumption may only be rebutted by a specific finding on the record that the application of the guidelines would be inequitable or inappropriate under the circumstances of a particular case. When the latter is true, [§ 46b-215a-5c (b) (1) (B)] allows deviation from the guidelines on the basis of a parent's earning capacity." (Internal quotation marks omitted.) Id.

"Our courts have interpreted this statutory and regulatory language as requiring three distinct findings in order for a court to properly deviate from the child

support guidelines in fashioning a child support order: (1) a finding of the presumptive child support amount pursuant to the guidelines; (2) a specific finding that application of such guidelines would be inequitable and inappropriate; and (3) an explanation as to which deviation criteria the court is relying on to justify the deviation." *Righi* v. *Righi*, 172 Conn. App. 427, 436–37, 160 A.3d 1094 (2017).

"This court has stated that the reason why a trial court must make an on-the-record finding of the presumptive support amount before applying the deviation criteria is to facilitate appellate review in those cases in which the trial court finds that a deviation is justified. . . . In other words, the finding will enable an appellate court to compare the ultimate order with the guideline amount and make a more informed decision on a claim that the amount of the deviation, rather than the fact of a deviation, constituted an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Budrawich* v. *Budrawich*, 132 Conn. App. 291, 300, 32 A.3d 328 (2011).

We next set forth our standard of review, which the parties dispute. The defendant contends that his claim involves the question of whether, and to what extent, the child support guidelines apply, which he maintains is a question of law subject to plenary review. The plaintiff responds that, because the issue in the present case is the application, not the interpretation, of the guidelines, the proper standard of review is abuse of discretion. We conclude that resolution of the defendant's claim requires us to interpret the language used in the court's memorandum of decision and subsequent articulations to determine whether the court calculated the presumptive support amount on the basis of the defendant's earning capacity, as the defendant claims, or on the basis of his actual income. "Because [t]he construction of a judgment is a question of law for the court . . . our review of the . . . claim is plenary. As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Cunningham* v. *Cunningham*, 204 Conn. App. 366, 373, 254 A.3d 330 (2021).

We conclude that the defendant's claim fails on the basis of the plain language used by the court. In its first articulation, the court expressly stated that it had found "the presumptive amount associated with each party's current income . . . ." That presumptive amount was

$300 weekly. This language demonstrates that the court used the defendant's actual income in calculating the presumptive support amount. Accordingly, we reject the defendant's claim to the contrary.

Having concluded that the court calculated the presumptive amount on the basis of the defendant's actual income, we note the subsequent findings of the court. The court found that the presumptive amount "was determined to be unfair and inequitable" and turned to the application of deviation criteria. It deviated upward on the basis of the defendant's earning capacity. Using the "defendant's consistent, prior income and the plaintiff's current income," the court calculated a support amount of $473 weekly. It determined that that amount, too, was unfair and inequitable. It then deviated downward, mentioning the parties' shared custody, the defendant's variability of income and his increased commuting expenses in connection with the plaintiff's move to Worcester. The court arrived at a child support amount of $325 weekly, which it noted was the same amount that the parties had agreed to pendente lite. The court further noted that the defendant had been able to comply with paying child support at this rate while also contributing approximately $500 per week to fund his retirement.

The defendant, in his principal appellate brief, omits any reference to or discussion of the court's explanation in its articulation that it had found a presumptive support amount of $300 on the basis of the parties' current incomes.[7] In his reply brief, the defendant argues for the first time on appeal that "[t]he fact that the court was able in one of its articulations to identify the presumptive amount based on [the defendant's] actual income does not mean that the court used this number in calculating child support, or deviated from this number to arrive at its child support order." He further argues in his reply brief that the articulation is inconsistent with the court's memorandum of decision. We decline to address these contentions because the defendant raised them for the first time on appeal in his reply brief. See *Radcliffe* v. *Radcliffe*, 109 Conn. App. 21, 27, 951 A.2d 575 (2008) ("It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . . Our practice requires an appellant to raise claims of error in his original brief, so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Internal quotation marks omitted.)); see also *Grimm* v. *Grimm*, 276 Conn. 377, 394 n.19, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

Lastly, the defendant argues that the court also failed to make a specific finding on the record as to *why* an obligation calculated in accordance with the defendant's actual income would be inequitable or inappro-

priate. We disagree with the defendant that the court's findings were deficient in this respect.

In support of his argument, the defendant relies on *Barcelo* v. *Barcelo*, 158 Conn. App. 201, 215, 118 A.3d 657, cert. denied, 319 Conn. 910, 123 A.3d 882 (2015). In that case, the trial court found that the defendant, at the time of the dissolution, was earning a salary of $70,000 and a " 'discretionary bonus in an undetermined amount.' " Id., 205. In awarding child support, the court failed to identify a presumptive support amount calculated on the basis of the defendant's current income. Id., 215. Instead, the court reviewed the defendant's prior annual net earnings and imputed an earning capacity to the defendant of $250,000. Id. The court based its child support order on that earning capacity. Id. The court then further ordered the defendant to pay the plaintiff 15 percent of any bonus he earned. Id.

On appeal, the plaintiff in *Barcelo* claimed that "the court erred by entering a supplemental child support order that awarded her 15 percent of the defendant's future bonus income without adequately considering the financial needs of the parties' minor children or abiding by the child support guidelines." Id., 207. This court found the trial court's supplemental child support order improper for several reasons, stating in part: "The court in the present case failed to cite the presumptive support amount calculated with the defendant's actual net income, and then did not invoke the defendant's earning capacity as a deviation criterion in calculating his child support obligation. It also did not explain why an obligation calculated in accordance with the defendant's actual income, pursuant to the child support guidelines, would be inequitable or inappropriate, thus warranting instead an obligation calculated in accordance with his earning capacity." Id., 215.

In *Barcelo*, the trial court failed to identify the presumptive amount of child support, imputed to the defendant a $250,000 earning capacity, and then "ordered the defendant to pay 15 percent of any of his bonus income, not 15 percent of any bonus income in excess of his $250,000 earning capacity." Id., 215. "As a result of this apparent ambiguity, the court, without justifying a deviation, permitted the plaintiff to 'double dip' and collect child support in excess of the child support guidelines with respect to whatever bonus income the defendant earned above his $70,000 salary but below his imputed earning capacity of $250,000." Id., 215–16.

The defendant also relies on *Fox* v. *Fox*, supra, 152 Conn. App. 637, another case in which the trial court imputed income to the defendant and calculated his child support obligation on the basis of that imputed income, without ever having calculated the defendant's presumptive child support obligation on the basis of his actual income. This court stated: "Because the court did not treat the defendant's earning capacity as a devia-

tion criterion, it did not subject the plaintiff's position that the court should base the defendant's modified child support obligation on his earning capacity instead of his actual income to the rigorous requirement of a specific finding on the record that the presumptive support amount would be inequitable or inappropriate. . . . Such a finding must include a statement of the presumptive support amount and [an explanation of] how application of the deviation criteri[on] justifies the variance. . . . Even though the court spoke generally of certain factors on which it relied in deciding to impute employment and investment income to the defendant . . . it did not articulate why the defendant's imputed income would be a more appropriate or equitable basis for calculating the defendant's modified child support obligation than the defendant's actual income or the presumptive support amount range . . . calculated in accordance with the defendant's actual income. The court's rationale for using the defendant's imputed income instead of his actual income in its calculations also lacks any reference to the demonstrated needs of the minor children, which further undermines any justification for the variance. Affirming the judgment with respect to the child support orders would amount to sanctioning the court's bypassing of and noncompliance with the guidelines' clear and firm requirements regarding the use of deviation criteria and presumptive support amounts." (Citations omitted; internal quotation marks omitted.) Id., 639–40.

Unlike the courts in *Barcelo* and *Fox*, the court in the present case provided sufficient justification for application of the deviation criteria of earning capacity. Specifically, the court calculated the presumptive support amount using the defendant's then current income and found such amount to be "unfair and inequitable." It found in its memorandum of decision that the defendant possessed an earning capacity that was "very near or at the top of his salary range." The court expressly stated in its first articulation that the defendant's earnings were "at or near the top of his salary range in 2013 . . . 2014 . . . 2015 . . . 2016 . . . and 2017 . . . before dropping nearly 50 percent to its current level." (Citations omitted.) The court referenced the plaintiff's testimony that the defendant had not discussed with her any anticipated, precipitous drop in his income. The court "did not find it credible that the defendant will be unable to earn more than he is making currently," which, at the time of trial, was approximately $100,000 annually. The court then expressly deviated from the presumptive amount on the basis of the defendant's earning capacity. In light of these findings, we are not persuaded that the court provided insufficient justification for applying the deviation criteria of earning capacity. See *Syragakis* v. *Syragakis*, 79 Conn. App. 170, 177, 829 A.2d 885 (2003) (court made all necessary findings when it found presumptive amount, determined that

such amount "would be inequitable or inappropriate in this particular case," and identified proper criteria for deviating from guidelines' presumptive amount (internal quotation marks omitted)).

## II

The defendant's second claim on appeal is that the court erred in basing its child support award on improper incomes for both parties. First, he argues that the court's determination of his earning capacity was clearly erroneous. Second, he argues that the court used the wrong actual income for the plaintiff, and third, he argues that the court should have imputed an earning capacity to the plaintiff reflective of more than an eighteen hour work week. We disagree.

We first set forth our standard of review. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . It is within the province of the trial court to find facts and draw proper inferences from the evidence presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Milazzo-Panico* v. *Panico*, 103 Conn. App. 464, 467–68, 929 A.2d 351 (2007).

## A

The defendant first argues that the court's determination of his earning capacity was clearly erroneous. Specifically, he argues that the evidence at trial established that the defendant's income is "dependent on factors outside of his control." In support of this argument, he references the trial court's finding that his income "depends on the number of grant-funded projects that are extant at any particular time." He further points to the expiration of three grants following the defendant's submission of his September, 2017 financial affidavit.

"It is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards on the earning capacity of the parties rather than on actual earned income. . . . Earning capacity, in this context, is not an amount which a person can theoretically earn, nor is it confined

to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Internal quotation marks omitted.) *Milazzo-Panico* v. *Panico*, supra, 103 Conn. App. 468.

We are not persuaded that the court's determination of the defendant's earning capacity was clearly erroneous. Specifically, the court's finding that the defendant has an earning capacity of $198,536 is supported by evidence in the record of the defendant's prior earnings. The court found that the defendant reported having earned "$184,000 in 2016; $180,000 in 2015; $202,000 in 2014, and $195,000 in 2013."

Moreover, the court reasonably determined that the defendant realistically could be expected to earn more than he was currently earning at the time of trial. The court found that the defendant's income depends on the number of grants that he applies for and receives. The court considered the expiration of three grants and noted the defendant's testimony that he and his colleagues were making efforts to replace those grants. The court expressly "did not find it credible that the defendant will be unable to earn more than he is making currently," which, at the time of trial, was approximately $100,000. "[T]he sifting and weighing of evidence is peculiarly the function of the trier [of fact]. [N]othing in our law is more elementary than that the trier [of fact] is the final judge of the credibility of witnesses and of the weight to be accorded to their testimony. . . . The trier has the witnesses before it and is in the position to analyze all the evidence. The trier is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Elia* v. *Elia*, 99 Conn. App. 829, 835, 916 A.2d 845 (2007).

Because the court's finding is supported by the evidence and we are not left with the definite and firm conviction that a mistake has been committed, we will not disturb the court's finding.

B

The defendant's second argument is that the court erred in its calculation of the plaintiff's income. We conclude that the court misstated the plaintiff's income but that such misstatement amounted to a scrivener's error and is therefore of no consequence.

The following additional facts are relevant. In its second articulation, the court stated that it found the plaintiff's income to be $56,576, with a net income of $49,192, and explained that this income was reported in the plaintiff's financial affidavit of September, 2018. As the defendant points out in his brief, the plaintiff's September 4, 2018 financial affidavit reported annual gross income of $41,600 and net income of $34,944. The plaintiff's May 7, 2019 financial affidavit, which was filed on

May 13, 2019, reported significantly higher annual gross income of $56,576 and net income of $49,192.

The defendant argues that, "based on the court's articulation, it is clear that it did not in fact base its child support award on the plaintiff's actual income at the time of the dissolution. Indeed, the court could not possibly have based its child support award on actual income of $56,576 gross because, at the time of the decision, the plaintiff had not yet filed that financial affidavit and instead reported actual income of $41,600." (Emphasis omitted.) The plaintiff agrees that the court misstated the plaintiff's income in its second articulation but contends that such misstatement was a scrivener's error. The plaintiff maintains that the court could not have used the income numbers from a financial affidavit that did not yet exist when it performed the calculations. She argues that "[t]he only logical reading is that the trial court correctly stated that it had 'found [the plaintiff's] annual income to be [the net and gross amounts] reported in her financial affidavit of September, 2018,' but accidentally wrote the wrong numbers, after correctly using the September, 2018 numbers in its actual calculations performed over a year before." (Emphasis omitted.) See *In re S.D.*, 115 Conn. App. 111, 120, 972 A.2d 258 (2009) (trial court's finding that respondent had not visited with child since child was five months old was clearly erroneous but that word "month" appeared to be scrivener's error). We agree with the plaintiff that the court's misstatement of the plaintiff's income amounted to a scrivener's error, where it properly referenced the applicable financial affidavit but improperly recorded the numbers reported on the later affidavit.

C

The defendant's third argument related to his claim of improper income determinations by the trial court is that the court abused its discretion in failing to impute an earning capacity to the plaintiff reflective of more than an eighteen hour work week. We disagree.

In its first articulation, the court stated that "[m]uch was made during the trial of whether or not it would be equitable to allow [the plaintiff] to work less than forty hours per week if [the defendant] was expected to work forty or more hours per week." Ultimately, the court found that the "nature of nursing as a profession can require intense interaction with others which would argue against the propriety of each nurse working as many hours and shifts as might be theoretically available . . . ." (Citation omitted.) The court found that "[m]aintaining per diem employment maximizes the plaintiff's hourly rate and allows for flexibility for caring for the children depending on the access schedule . . . ." (Citation omitted.)

As explained previously in this opinion, "[i]n marital

dissolution proceedings, *under appropriate circum-stances* the trial court *may* base financial awards on the earning capacity rather than the actual earned income of the parties . . . ." (Emphasis in original; internal quotation marks omitted.) *Brown* v. *Brown*, 148 Conn. App. 13, 21, 84 A.3d 905, cert. denied, 311 Conn. 933, 88 A.3d 549 (2014). Having thoroughly reviewed the record, we conclude that it supports the trial court's findings and that the court did not abuse its discretion in calculating child support on the basis of the plaintiff's actual income, rather than attributing to her a greater earning capacity.

On the basis of the foregoing, we reject the defendant's claim that the court erred in determining the parties' income.

### III

The defendant's third claim on appeal is that, "[b]y ordering [him] to reimburse the plaintiff for making voluntary payments toward the principal mortgage on the marital home and for making contributions to the children's CHET accounts, the court effectively made a finding of dissipation, but failed to meet the necessary elements for such a finding." The plaintiff responds that the court properly divided the assets in the marital estate considering the defendant's "unilateral financial decisions, made with marital assets when the marriage was in trouble or after the plaintiff filed for divorce, [which] aggravated the parties' difficulties, and sought to restrict how the marital estate could be divided." We agree with the plaintiff.

The following additional facts and procedural history are relevant to this claim. The plaintiff, in her proposed orders, requested that the court order the defendant to pay her a lump sum property settlement of $60,000, which, the plaintiff maintained, "shall equalize the [parties'] cash assets and reimburse the plaintiff, in part, for the defendant's withdrawal of some $100,000 over the course of the past two years." In its memorandum of decision, the court ordered the defendant to pay the plaintiff "a lump sum property settlement of $52,500," which, the court stated, "includes settlement for the plaintiff's marital share of the Nicaragua house,[8] partial reimbursement for funds transferred to the children's CHET accounts and mortgage overpayments on the Ashford [home] made by the defendant." (Footnote added.) The funds transferred to the children's CHET accounts included $10,000 into each of the CHET accounts for the parties' children and $40,000 into the CHET account for the defendant's older child. The mortgage "overpayments" included two $10,000 mortgage payments on the Ashford home. The court found that the decisions to transfer marital assets, into the children's CHET accounts and into additional mortgage payments on the Ashford home, were made unilaterally by the defendant. In its first articulation, the court noted

"that the plaintiff was not seeking that [moneys] placed in [the defendant's older child's] account and in the accounts designated for each of the twins be returned but in the interest of equity and fairness the court's cash settlement order included reimbursement for the use of marital funds transferred without the input of the plaintiff."

We first must resolve the parties' dispute regarding the applicable standard of review of this claim. The defendant contends that our standard of review is plenary because this court must address the question of what, as a matter of law, constitutes dissipation.[9] The plaintiff contends that we must review the court's ultimate orders for an abuse of discretion and its factual findings for clear error. We conclude that the defendant's claim first requires us, as a preliminary matter, to interpret the judgment of the trial court. "Because [t]he construction of a judgment is a question of law for the court . . . our review of the . . . claim is plenary. As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Cunningham* v. *Cunningham*, supra, 204 Conn. App. 373.

We begin our analysis by addressing the defendant's contention that, "[a]lthough the court did not use the word 'dissipation,' it is clear that is what the court intended." "Generally, dissipation is intended to address the situation in which one spouse conceals, conveys or wastes marital assets in anticipation of a divorce. . . . Most courts have concluded that some type of improper conduct is required before a finding of dissipation can be made. Thus, courts have traditionally recognized dissipation in the following paradigmatic contexts: gambling, support of a paramour, or the transfer of an asset to a third party for little or no consideration. Well-defined contours of the doctrine are somewhat elusive, however, particularly in more factually ambiguous situations." (Internal quotation marks omitted.) *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 469–70, 165 A.3d 1124 (2017).

In determining whether the trial court's order, in effect, constituted a finding that the defendant had engaged in dissipation of marital assets, we first note that the term "dissipation" does not appear anywhere in the court's memorandum of decision or subsequent articulations. Moreover, the language that the court did use—describing the award to the plaintiff as being made "in the interest of equity and fairness"—is consistent

with the equitable determinations involved in the distribution of marital property. Lastly, we do not conclude that the court's use of the term "reimbursement" was an indication that it was relying on the dissipation doctrine. Indeed, the defendant was not ordered to "reimburse" the plaintiff for the loss of funds that no longer existed because of financial misconduct on the part of the defendant. Rather, the marital property merely had been changed into another form. In sum, the trial court's order rested not on a finding that the defendant had engaged in financial misconduct or intentionally had wasted marital assets but rather on its finding that the defendant unilaterally had allotted portions of the marital estate solely in accordance with his own financial priorities. Thus, we conclude that the court's order did not invoke the doctrine of dissipation.

Having determined that the court's order did not, in effect, constitute a finding of dissipation, we consider whether the court's order that the defendant pay the plaintiff $52,500 constituted an abuse of discretion.

General Statutes § 46b-81 governs the distribution of the assets in a dissolution case. Section 46b-81 (a) authorizes the court to "assign to either spouse all or any part of the estate of the other spouse. . . ." Section 46b-81 (c) provides for the court's consideration of "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

"[A] fundamental principle in dissolution actions is that a trial court may exercise broad discretion in . . . dividing property as long as it considers all relevant statutory criteria. . . . While the trial court must consider the delineated statutory criteria [when allocating property], no single criterion is preferred over others, and the court is accorded wide latitude in varying the weight placed upon each item under the peculiar circumstances of each case. . . . In dividing up property, the court must take many factors into account. . . . A trial court, however, need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor." (Internal quotation marks omitted.) *Kent* v. *DiPaola*, 178 Conn. App. 424, 431–32, 175 A.3d 601 (2017).

The specified criteria in § 46b-81 are not exhaustive, and the court properly may consider other equitable factors when crafting its property distribution orders. "Although created by statute, a dissolution action is essentially equitable in nature. . . . The power to act

equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. . . . [Section] 46b-81 sets forth certain criteria for the court to consider in making an assignment of property. Although in making its financial determinations the court is required to consider these criteria . . . in the exercise of its inherent equitable powers it may also consider any other factors which may be appropriate for a just and equitable resolution of the marital dispute." (Citations omitted; internal quotation marks omitted.) *Robinson* v. *Robinson*, 187 Conn. 70, 71–72, 444 A.2d 234 (1982).

In the present case, the court found that "[t]he evidence elicited supported the court's determination that [the defendant] was protective of his own finances to the detriment of his relationship with the plaintiff and was resentful of challenges to his financial priorities and decisions." Moreover, the court specifically found that the additional mortgage payments for the Ashford home and the CHET deposits into the three accounts were unilateral decisions of the defendant. These findings are supported by evidence in the record. Specifically, the defendant testified that he had made two $10,000 payments on the Ashford home mortgage in June and August, 2016. When questioned regarding the $20,000 sum of the mortgage payments, the defendant testified that he probably did not discuss the payments with the plaintiff before making them but that, when he did discuss them with her, she was "very angry about it." With respect to the deposits into the CHET accounts for the parties' children, the defendant was asked whether he discussed them with the plaintiff and he responded, "[W]hen I put in the $10,000 [each], that was after her filing for divorce and I figured then I would just decide that on my own." As to his older child's CHET account, the defendant testified that he deposited $40,000 into it and that he did not remember whether he told the plaintiff he had made such a deposit.

The plaintiff, both in her proposed orders and in her testimony at trial, sought a lump sum property distribution award in consideration of these unilateral financial transactions.[10] She testified that she believed a $60,000 lump sum award would be fair because she "fe[lt] that [the defendant] has systematically withdrawn large sums of money in order to pay down his personal debt, his mortgage, increase the CHET funds of [his older child]. [The defendant] stated in the past . . . while divorcing . . . his first wife, this was a pattern he had created in order to avoid paying her any money, and I believe he's doing the same here." She further clarified, when asked whether she was "still looking for $60,000 even though [the defendant had] been funding the children's education," that her "desire to have the $60,000 did not factor on the CHET account[s] alone."

In rendering its property division orders, the court

considered the defendant's several unilateral financial transactions, which, although they increased the equity in the Ashford home and set aside funds for the three children's college education, were made without the input of the plaintiff and had the effect of reducing the liquid assets available for distribution. Having reviewed the evidence before the court, we cannot conclude that the court abused its broad discretion in dividing the parties' property as it did.[11]

IV

The defendant's fourth claim on appeal is that the court erred in awarding the plaintiff appellate counsel fees. We disagree.

The following additional procedural history is relevant to this claim. Following the defendant's appeal to this court, the plaintiff filed a motion for an order of attorney's fees, in which she requested that the defendant be ordered to pay the $25,000 retainer required by the plaintiff's appellate attorney. The court held a hearing on the plaintiff's motion on May 13, 2019. Both parties submitted financial affidavits and testified. The defendant testified that he had borrowed money from his brother to pay his appellate attorney. He testified that he did not have any liquid assets, had incurred credit card debt, and thought that he could not access his retirement funds without incurring taxes and penalties. He testified that the estate of his mother was being handled by his two siblings and that he did not know the monetary value of it. The plaintiff also testified that she had borrowed funds from her siblings to pay her appellate attorney's retainer. She testified that she anticipated owing anywhere between $50,000 and, more likely, $80,000 in attorney's fees by the end of the appellate process.

On August 23, 2019, the court issued its memorandum of decision in which it granted the plaintiff's motion for attorney's fees. The court made the following findings of fact in support of its award: the defendant has a demonstrated earning capacity that far exceeds his current income, and, even with the reduced income, he still has maintained a higher income than the plaintiff; the defendant has access to substantial retirement funds; the defendant's assets are nearly double those of the plaintiff, including the defendant's substantial equity in his real estate holdings; the amount required to retain appellate counsel is nearly one half of the amount of the financial award made to the plaintiff in the dissolution judgment, and requiring the plaintiff to spend those funds on appellate counsel to defend the appeal of the defendant, who has substantially greater assets available to him, would undermine the court's purpose in making the financial award; and the plaintiff lacked sufficient liquid funds to defend against the appeal. Taking into consideration the criteria contained in General Statutes §§ 46b-62 (a) and 46b-82 and in our

Supreme Court's decision in *Hornung* v. *Hornung*, 323 Conn. 144, 169–70, 146 A.3d 912 (2016), the court ordered the defendant to pay the plaintiff $25,000 for the retainer costs of her appellate counsel.

"Section 46b-62 (a) authorizes the trial court to award attorney's fees in a dissolution action when appropriate in light of the respective financial abilities of the parties and the equitable factors listed in § 46b-82. . . . [W]e [have] stated three broad principles by which these statutory criteria are to be applied. First, such awards should not be made merely because the obligor has demonstrated an ability to pay. Second, where both parties are financially able to pay their own fees and expenses, they should be permitted to do so. Third, where, because of other orders, the potential obligee has ample liquid funds, an allowance of [attorney's] fees is not justified. . . .

"A determination of what constitutes ample liquid funds . . . requires . . . an examination of the total assets of the parties at the time the award is made. . . . We have recognized, however, that [t]he availability of sufficient cash to pay one's attorney's fees is not an absolute litmus test . . . . [A] trial court's discretion should be guided so that its decision regarding attorney's fees does not undermine its purpose in making any other financial award. . . .

"Whether to allow [attorney's] fees, and if so in what amount, calls for the exercise of judicial discretion by the trial court. . . . An abuse of discretion in granting [attorney's] fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did." (Citations omitted; internal quotation marks omitted.) *Hornung* v. *Hornung*, supra, 323 Conn. 169–70.

The defendant contends that the court's award of attorney's fees runs afoul of our Supreme Court's decision in *Hornung*. In *Hornung*, the court awarded the plaintiff $100,000 in trial attorney's fees and $40,000 in appellate attorney's fees. Id., 168. The defendant claimed on appeal that "the plaintiff received ample liquid funds from the trial court's judgment with which to pay her attorney's fees, and that the trial court's conclusion that not awarding her attorney's fees would undermine its other awards to her was unreasonable." Id., 168–69. Our Supreme Court agreed with the defendant. It first considered that the trial attorney's fees award "represent[ed] a very small portion of the liquid assets awarded to the plaintiff in the trial court's judgment." Id., 173. Specifically, this court noted that "the plaintiff [was to] receive liquid assets totaling $2,577,000 within three months of the judgment" and that the fee award "represent[ed] only 4 percent of this amount." Id. The plaintiff was to receive "$2,082,000, the amount owed to her under the [parties' prenuptial] agreement, within sixty days of the judgment; $40,000 per month

in periodic alimony and child support, starting twelve days from the judgment; and $7.5 million in lump sum alimony, payable in biannual installments of $375,000, starting two and one-half months from the judgment." Id. The Supreme Court concluded that, "given the vast liquid assets awarded to the plaintiff, and the modest nature of the attorney's fees when compared with those assets, the equitable factors in § 46b-82, as incorporated into § 46b-62, do not justify the award." Id., 177.

We conclude that *Hornung* is distinguishable from the present case in which, as the defendant recognizes, "neither party had the liquid funds available to pay their respective appellate counsel fee retainers." The present case is more akin to *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 386–87, 999 A.2d 721 (2010), in which our Supreme Court rejected the defendant's argument that the trial court abused its discretion in awarding attorney's fees. Our Supreme Court determined that the majority of assets awarded to the plaintiff in the dissolution were not liquid, noting that "$2.6 million of the approximately $3.2 million in assets awarded to the plaintiff consisted of the family home in which the plaintiff and the parties' three minor children resided" and "also included her interest in a trust . . . certain retirement accounts, vested stock and vested stock options." Id.

In the present case, the court expressly found that the plaintiff lacked the liquid assets to pay her attorney's appellate retainer. Indeed, several of the assets awarded to the plaintiff in the dissolution judgment were not easily liquidated. Specifically, she was awarded her Worcester home, in which she reported $68,858 in equity, $175,000 in retirement accounts to be transferred by way of a qualified domestic relations order, $71,035 in her retirement plan, and $2665 in equity in her motor vehicle.[12] The only assets that the plaintiff was awarded that were capable of immediate liquidation were the lump sum property settlement of $52,500, $5000 in funds that were held by the caretaker of the Nicaragua property, and $6801 in bank accounts.[13] As the plaintiff maintains, the $25,000 retainer alone amounted to almost 40 percent of her liquid assets. Thus, we cannot conclude that the plaintiff had "ample" liquid funds such that the court abused its discretion in awarding her attorney's fees.

Moreover, the court also specifically found that requiring the plaintiff to pay the $25,000 retainer would undermine the financial awards made in the dissolution judgment, and the defendant has not demonstrated that such finding was unreasonable. See *Grimm* v. *Grimm*, supra, 276 Conn. 395, 398 (holding that trial court reasonably could have determined that $100,000 fee award to plaintiff was necessary to avoid undermining $100,000 lump sum alimony award, despite plaintiff earning more than $100,000 per year, possessing signifi-

cant retirement accounts, and having been awarded both of parties' Connecticut residences).

Lastly, in addition to the court's finding that not awarding the plaintiff attorney's fees would undermine the other financial orders, the court's decision expressly stated that it had considered the statutory criteria set forth in § 46b-82. See *Leonova* v. *Leonov*, 201 Conn. App. 285, 331, 242 A.3d 713 (2020) ("general reference by the court to those criteria is all that is required"), cert. denied, 336 Conn. 906, 244 A.3d 146 (2021). The court went further and made specific findings regarding the parties' earning capacities, current income levels, access to retirement funds, assets, and the amount of counsel fees sought as compared to the financial awards the plaintiff received in the dissolution.

Accordingly, we conclude that the court did not abuse its discretion in awarding the plaintiff appellate attorney's fees to defend the present appeal.

V

The defendant's final claim on appeal is that the court's custodial orders are contrary to the best interest of the children in two ways. First, the defendant challenges the court's order permitting the plaintiff to relocate to Massachusetts and designating the plaintiff's residence as primary for purposes of school enrollment.[14] Second, he argues that the 6:15 a.m. transfer time negatively impacts the quality of his time with the parties' children. We disagree that the court abused its discretion in entering its custodial orders.

The following additional facts and procedural history are relevant to this claim. The plaintiff, in her proposed orders, sought an order requiring the parties' children to attend a preschool program in or near Worcester. The defendant, in his proposed orders, requested that "[t]he children's primary residence for school purposes should be the residence of the father." He further requested, in his proposed orders regarding the parties' parenting plan and schedule: "The plaintiff may move to her house . . . in Worcester, MA. Other than that, parties may only move to a location in Connecticut within 20 minutes driving distance from the matrimonial home." He further proposed: "On a nonschool day the relinquishing parent may, for work reasons, drop off the children to the receiving parent at any time between 6 a.m. and 9 a.m., with [seven day] prior notice."

At trial, the court heard evidence regarding the plaintiff's requested relocation to Worcester. The plaintiff testified that, although she was currently renting a home in Tolland, she owns a home in Worcester that she rents to tenants and that she planned to relocate back to the Worcester home. She testified that the Worcester home was about forty minutes driving distance, without rush hour traffic, from the Ashford home.

The plaintiff testified that she had looked into two

preschool programs in the Worcester area and explained the schedules and costs of each program. As to the public school system, the plaintiff testified that she preferred the Worcester area school system to that of Ashford, although she acknowledged that the Ashford school system, which she described as average, has good teachers. The defendant testified that both Ashford and Tolland have very good school systems and that the Worcester district where the Worcester home is located is average among the schools in the city of Worcester and is on the lower end of schools in the county of Worcester.

The family services counselor, Sarantopoulos, testified that it was her recommendation that if the plaintiff relocated to Worcester, the children should attend a preschool program in Worcester. She did not do any research regarding the preschool programs or public schools of Worcester or Ashford, as that task would be beyond the scope of her evaluation.

With respect to the transfer time, the plaintiff testified that she was requesting a 6:15 a.m. transfer time because she could not work day shifts with a 9 a.m. transfer time and that time would facilitate the defendant's commute to Boston. She also thought an earlier transfer time worked to the children's benefit, stating: "They're up, they're ready to go, versus a 9 a.m. time period is— toddlers, they're . . . playing. They don't want to be interrupted." Sarantopoulos testified with respect to the earlier transfer time that she would have no issue with it if the parties agreed to that time, while at the same time recognizing that getting the children up at 4:30 or 5 a.m. "would be early if that is not their natural wake-up time . . . ." The plaintiff clarified that she was requesting that the parent beginning their parenting time pick up the children, so that the children would not have to wake up earlier.

The defendant testified that the plaintiff's relocation to Worcester would increase his commuting time. Specifically, he testified that it would increase his commute to Boston by forty minutes.

In its memorandum of decision, the court entered the following parenting schedule: "Week 1: [The defendant] will have the children from Sunday through Wednesday morning at 6:15 a.m. with [the plaintiff] picking up the children at 6:15 a.m. [The plaintiff] will have the children from Wednesday [at] 6:15 a.m. until Monday morning with [the defendant] picking up the children at 6:15 a.m. . . .

"Week 2: [The defendant] will have the children Monday through Wednesday morning with [the plaintiff] picking up the children at 6:15 a.m. [The plaintiff] will have the children from Wednesday at 6:15 a.m. through Friday afternoon with [the defendant] picking up the children at 1:30 p.m. [The defendant] will have the chil-

dren from Friday through Sunday and the schedule repeats." The court also ordered that the children be enrolled in a preschool program in the Worcester area and that, once the children attained the age to begin kindergarten, both parents shall have input on which Worcester area schools would be the best fit for the children. In the event that the parties were unable to reach agreement as to which school the children should attend, the plaintiff's selection would prevail.

"Our standard of review of a trial court's decision regarding custody, visitation and relocation orders is one of abuse of discretion. . . . [I]n a dissolution proceeding the trial court's decision on the matter of custody is committed to the exercise of its sound discretion and its decision cannot be overridden unless an abuse of that discretion is clear. . . . The controlling principle in a determination respecting custody is that the court shall be guided by the best interests of the child. . . . In determining what is in the best interests of the child, the court is vested with a broad discretion. . . . [T]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court, but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . .

"The trial court has the opportunity to view the parties [firsthand] and is therefore in the best position to assess the circumstances surrounding a dissolution action, in which such personal factors as the demeanor and attitude of the parties are so significant. . . . [E]very reasonable presumption should be given in favor of the correctness of [the trial court's] action. . . . We are limited in our review to determining whether the trial court abused its broad discretion to award custody based upon the best interests of the child as reasonably supported by the evidence." (Internal quotation marks omitted.) *Lederle* v. *Spivey*, 113 Conn. App. 177, 185–86, 965 A.2d 621, cert. denied, 291 Conn. 916, 970 A.2d 728 (2009).

"[General Statutes §] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [sixteen enumerated] factors . . . . The court is not required to assign any weight to any of the factors that it considers."[15] (Internal quotation marks omitted.) Id., 187.

The defendant argues that the plaintiff established no good cause for relocating, while the relocation negatively impacted the defendant's commute and the qual-

ity of the children's time with him. He further contends that, "[o]n the days when [he] has the children both before and after school, he will be forced to drive nearly an extra three hours, cutting into either his workday or into his time with the children." He argues that there was no evidence presented that Worcester "is superior culturally, educationally, or in any other way," to Ashford and that there was no compelling reason to designate the Worcester home as the primary residence for school enrollment purposes.

With respect to the defendant's challenge to the court's designation of the plaintiff's Worcester home as primary for school enrollment purposes, the court had before it both parties' testimony regarding their positions on the Ashford and Worcester school systems and Sarantopoulos' recommendation that the children attend a preschool program in Worcester. The defendant essentially requests that we reweigh that evidence in his favor. "[W]e do not retry the facts or evaluate the credibility of witnesses." (Internal quotation marks omitted.) *Brown* v. *Brown*, supra, 148 Conn. App. 20.

As to the defendant's challenge to the transfer times, the court heard evidence that the parties' children wake up early and that an early transfer time would permit the plaintiff to work day shifts. Thus, our review of the record finds support for the court's order. Moreover, in his proposed orders, the defendant contemplated that "for work reasons," the children could be exchanged "at any time between 6 a.m. and 9 a.m., with [seven] day prior notice." It was not an abuse of discretion to set 6:15 a.m. as the usual transfer time, rather than direct the parents to implement an optional 6:15 a.m. transfer time. Finally, the court stated in its memorandum of decision that it had taken into consideration the statutory criteria and applicable case law and had applied it to the evidence. "[T]he trial court is presumed to have applied the law correctly, and it is the burden of the appellant to show to the contrary." (Internal quotation marks omitted.) *Brown* v. *Brown*, supra, 148 Conn. App. 20.

Accordingly, we conclude that the court did not abuse its broad discretion in formulating its custodial orders.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Prior to the planned relocation to Worcester and for so long as the plaintiff continued to reside in Tolland and the defendant in Ashford, the defendant's residence was designated as primary.

[2] The defendant was ordered to transfer to the plaintiff $5000, which was equal to the amount of money held by a caretaker of the Nicaragua property.

[3] On December 19, 2018, the defendant filed a motion to reargue, which was denied.

[4] The court also found that "[t]he rationale for having a full-time nursing schedule of less than forty hours was credible and uncontroverted. The court note[d] that the nature of nursing as a profession can require intense interaction with others which would argue against the propriety of each nurse working as many hours and shifts as might be theoretically available . . . ." (Citation omitted.)

[5] The court noted that the plaintiff was aware of the defendant's pay structure but that he had not discussed any anticipated, precipitous drop in income with her.

[6] As to the valuation of property, the court stated in its second articulation that the house in Nicaragua was purchased for $167,000, $145,000 of which came from an account the defendant had established prior to the marriage. The court found the house in Nicaragua to have a value of "at least $50,000," and determined that it would increase in value should the country's unrest subside. The court valued the defendant's interest in the cows at $5000 and awarded the plaintiff $5000 for her interest in the cows that were awarded to the defendant. The court valued the defendant's retirement accounts at $601,673 and found that there had been a $350,000 increase in the value of those accounts during the course of the marriage.

[7] The defendant does not raise any claim of error on appeal that the $300 presumptive support amount was improperly calculated.

[8] In its first articulation, the court stated that the defendant was credited with having provided the majority of funds for the purchase of the house in Nicaragua. The court stated: "At the time of the marriage the account from which the funds were eventually drawn contained approximately $145,000 including $20,000 that had originally been set aside from the couple's wedding in Sweden . . . . There was, however, some time that passed prior to the purchase of the Nicaragua house for $167,000. Because the majority of the funds used to buy the house were the defendant's from before the marriage, the court divided the amount of the additional funds used to buy the house as a part of a cash settlement for [the plaintiff]." (Citation omitted.)

[9] Moreover, in his reply brief, the defendant relies on *O'Brien* v. *O'Brien*, 326 Conn. 81, 95–96, 161 A.3d 1236 (2017), in which our Supreme Court engaged in plenary review of the question of law regarding whether the trial court, in distributing marital property, had the authority, in the absence of a finding of contempt, to consider certain stock transactions made by the plaintiff during the pendency of the appeal from the judgment of dissolution in violation of the automatic orders. *O'Brien* is distinguishable from the present case. In *O'Brien*, the court had before it the distinct question of whether the trial court properly could remedy the plaintiff's violations of the automatic orders by adjusting in the defendant's favor the distribution of marital assets to account for the losses caused by the plaintiff's actions. Id., 95.

[10] The plaintiff clarified that she was not asking the court to return the CHET deposits to her or making a claim to the equity in the Ashford home. Specifically, she acknowledged that funding the CHET accounts is a desirable thing for a parent to do and testified that she was not making a claim against the equity in the Ashford home, even acknowledging that the defendant previously had made additional payments of $20,000 on the mortgage during the course of the marriage.

[11] The defendant states in his principal brief that the court provided in its articulations different values for the children's CHET accounts. The court's first articulation refers to the transactions made by the defendant—the deposits into the accounts for the parties' children in the total amount of $20,000 and the deposit into the account for the defendant's older child in the amount of $40,000. The second articulation values the CHET accounts for the parties' children at $11,656.07 each and for the defendant's older child at $11,656.07. We note that the defendant's September, 2018 financial affidavit values the account for the defendant's older child at $115,179, and the defendant testified at trial that the value of that account was "over [$100,000]." We are convinced that the value identified in the second articulation for the CHET account for the defendant's older child constitutes a scrivener's error. First, it is identical to the value of the accounts for the parties' children, suggesting that the court merely improperly repeated the value. Second, the trial court previously had articulated that it found that the defendant had transferred $40,000 into his older child's account. Thus, it clearly recognized the significantly greater value of that account.

In his reply brief, the defendant notes that his September, 2018 financial affidavit values the CHET accounts for the parties' children at $12,322 each. We note that the values identified by the trial court for the accounts for the parties' children correspond with those identified on the CHET account statements entered into evidence during trial. Any discrepancy in the values of the CHET accounts for the parties' children is immaterial to our analysis, as the only order of the court pertaining to the CHET accounts is the order that the defendant "shall continue to maintain the current CHET accounts for the benefit of the minor children."

[12] The defendant, in his appellate brief, contends that the "plaintiff's total property award was approximately \$384,194, of which \$308,535 was liquid." The defendant includes in this amount the plaintiff's retirement assets, which he maintains "typically can be transferred into liquid form with a penalty and a tax." Although the trial court found that the defendant "has substantial retirement funds that are not so encumbered that they cannot be accessed," we are not convinced that the retirement assets need be considered "liquid" for purposes of determining whether the plaintiff has "ample liquid assets" with which to pay her attorney's fees. See *Olson* v. *Mohammadu*, 169 Conn. App. 243, 265–66, 149 A.3d 198 (court did not abuse its discretion in awarding plaintiff appellate attorney's fees when it found that plaintiff did not have sufficient liquid assets with which to pay her own legal fees, and trial court was not persuaded that plaintiff's retirement assets constituted sufficient liquid assets to enable plaintiff to pay her own fees), cert. denied, 324 Conn. 903, 151 A.3d 1289 (2016); see also *Misthopoulos* v. *Misthopoulos*, supra, 297 Conn. 386 (categorizing payee's retirement accounts as not liquid).

[13] The plaintiff's financial affidavit listed two checking accounts with values of \$1563 and \$5228 and a savings account with a value of \$10.

[14] In his principal brief, the defendant sets forth the factors for consideration to determine the best interest of the child in a *postjudgment* relocation matter, as adopted by our Supreme Court in *Ireland* v. *Ireland*, 246 Conn. 413, 431–32, 717 A.2d 676 (1998). "[Those] factors are: [E]ach parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements. . . . [Another relevant factor is] the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships." (Internal quotation marks omitted.) *Ford* v. *Ford*, 68 Conn. App. 173, 178, 789 A.2d 1104, cert. denied, 260 Conn. 910, 796 A.2d 556 (2002).

As the defendant's counsel recognized during oral argument before this court, the court is not required to apply the *Ireland* factors in the case of relocation issues arising coincident to the dissolution of marriage. See id., 184.

[15] The following factors are set forth in General Statutes § 46b-56 (c): "(1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. . . ."